FRANK O. ALFORD, WILKIE P. BEATTY, AS EXECUTRIX OF THE ESTATE OF
PAUL B. BEATTY, CARSON INSURANCE AGENCY, INC., PATRICIA A.
EDLUND, STANLEY EDLUND, JAMES M. GILFILLIN, LARRY G. GOLD-
BERG, RAQUEL T. GOLDBERG, BETTY F. RHYNE, ROBERT R. RHYNE
AND NORMAN V. SWENSON, DERIVATIVELY IN THE RIGHT OF ALL
AMERICAN ASSURANCE COMPANY, PLAINTIFFS v. ROBERT T. SHAW,
AMERICAN COMMONWEALTH FINANCIAL CORPORATION, GREAT
COMMONWEALTH LIFE INSURANCE COMPANY, ICH CORPORATION,
CHARLES E. BLACK, S. J. CAMPISI, ROY J. BROUSSARD, TRUMAN D.
COX, FRED M. HURST, C. FRED RICE, AND PEGGY P. WILEY, DEFEND-
ANTS, AND ALL AMERICAN ASSURANCE COMPANY, BENEFICIAL PARTY

No. 132PA85

(Filed 7 October 1986)

1. **Corporations §§ 4, 6— shareholders' derivative action—fraud and self-dealing
alleged against majority of directors—litigation committee recommends set-
tling or not pursuing claims—modified business judgment rule adopted**

In a shareholders' derivative action in which self-dealing and fraud were
alleged against the majority of the board of directors, the Supreme Court
adopted a version of the business judgment rule of *Auerbach v. Bennett*, 393
N.E. 2d 994, which limits judicial inquiry into a special litigation committee's
judgment on pursuing litigation to whether the committee was composed of
disinterested independent directors who acted in good faith and followed ap-
propriate investigative procedures, modified to place the burden on defendants
at a summary judgment hearing to show that the committee was composed of
directors who were disinterested and independent and who conducted an ap-
propriately thorough investigation. If the independence of the directors and
the reasonableness of their investigation is established, the directors' good
faith in carrying out their duties will be presumed in the absence of evidence
to the contrary.

2. **Corporations §§ 4, 6— shareholders' derivative action—fraud and self-dealing
alleged against directors—recommendation of special litigation committee
against pursuing claims—summary judgment for defendants proper**

The trial judge properly granted defendants' motions for summary judg-
ment in a shareholders' derivative action in which plaintiffs were minority
shareholders; plaintiffs had alleged fraud and self-dealing by a majority of the
board of directors; the board of directors established a special investigative
committee to conduct an investigation and determine whether any legal action
should be initiated; the committee recommended that all except two of the
claims investigated not be asserted and that the remaining two claims be set-
tled; the record discloses that the board of directors made every effort to in-
sure that outside counsel and the two outside directors comprising the special
litigation committee met the requisite qualifications of independence and
disinterestedness; plaintiffs did not challenge the independence of the commit-
tee except through general, broad allegations of structural bias; the committee
interviewed sixteen people, reviewed approximately 3,750 documents, submit-

Alford v. Shaw

ted interrogatories to each person who served as a director during the relevant period, and prepared a 409-page report in addition to an appendix which included twenty-five exhibits; the affidavit submitted by plaintiffs contained a challenge to the committee's judgment, not to its independence or good faith, and did not suggest any available information which the committee did not consider; plaintiffs' counsel was afforded every opportunity to provide the committee with information which might have been helpful in assessing the merits of the claims; and the report of the special committee left no doubt that the investigation was exhaustive and undertaken seriously and in good faith, following procedures sufficiently broad in scope and conscientious in execution to insure a thorough review of all allegations and related matters.

Justice FRYE concurring in part and dissenting in part.

Justice MARTIN dissenting.

ON discretionary review, pursuant to N.C.G.S. § 7A-31 from a decision of the Court of Appeals, 72 N.C. App. 537, 324 S.E. 2d 878 (1985), reversing judgment entered by *Snepp, J.*, on 12 December 1983 in Superior Court, MECKLENBURG County. Heard in the Supreme Court on 18 December 1985.

*Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by Ralph M. Stockton, Jr. and Daniel R. Taylor, Jr., for plaintiff All American Assurance Company.*

*Cansler & Lockhart, P.A., by Thomas Ashe Lockhart and Bruce M. Simpson, for plaintiff-appellees.*

*Adams, Kleemeier, Hagan, Hannah & Fouts, by Daniel W. Fouts and Bruce H. Conners, and Peter G. Pappas, for defendant-appellants Charles E. Black, S. J. Campisi, Roy J. Broussard, Fred M. Hurst, Peggy P. Wiley and Truman D. Cox.*

BILLINGS, Chief Justice.

The sole issue on appeal is whether, in North Carolina, the business judgment rule may be applied to a special litigation committee's decision not to pursue derivative claims based upon charges of fraud and self-dealing by a majority of the members of the board of directors of the corporation asserted by minority shareholders. The Court of Appeals concluded that the business judgment rule, "traditionally used by our courts as a defense *on the merits* to allegations of fraud," could not be invoked as "a procedural device to dispose of derivative litigation," 72 N.C. App. at 548, 324 S.E. 2d at 886, and reversed the order of the trial judge

granting summary judgment on all but two claims and approving settlement of the remaining claims. We reverse.

## I.

### A.

As a result of certain demands made on behalf of a number of minority shareholders of All American Assurance Company ("AAA"), that company's board of directors adopted a resolution establishing a "Special Investigative Committee." The Committee was authorized, "in their independent discretion and judgment," to conduct an investigation into the matters about which complaint had been made and "to determine in their independent judgment based upon such investigation whether in the best interest of AAA and its shareholders any claim or demand shall be made or asserted . . . or whether any legal action shall be initiated against any person or other entity."

Prior to completion by the special litigation committee of its investigation, plaintiffs filed a shareholder's derivative suit in Superior Court, Mecklenburg County. The allegations in the complaint, for the most part, paralleled the claims made earlier which were then under investigation by the Committee. Included in the complaint were allegations of "wrongful, unlawful and fraudulent transactions" undertaken by defendants[1] "to the enormous loss and detriment of All American."

Within a year after the complaint was filed, the special litigation committee completed its investigation and filed its report. The Committee recommended that all except two of the claims investigated[2] not be asserted and that the two remaining claims be settled.

---

1. The individual defendants were at the time members of the board of directors of AAA and constituted a majority of the Board.

2. The Committee investigated the original claims and the allegations in the complaint. Also considered were allegations in a class action suit brought in the United States District Court for the Western District of North Carolina on behalf of certain minority shareholders seeking to recover damages from defendants Shaw, Great Commonwealth Life, and American Commonwealth Financial Corporation. The federal lawsuit was filed after the special litigation committee had begun its investigations but prior to the filing of the shareholder's derivative suit.

Alford v. Shaw

Based on the recommendations of the special litigation committee, defendant AAA moved for summary judgment on all claims except the two which were the subject of a settlement agreement and for approval of the settlement agreement. In addition, defendants Wiley, Campisi, Hurst, Broussard, Black and Cox moved for summary judgment.

Judge Snepp granted the motions, reasoning that:

The Court is of the opinion that the business judgment rule controls the disposition of this case and, therefore, that the only issues before it are whether the Special Committee was composed of disinterested, independent directors who acted in good faith, and whether the scope of the investigation and the procedures adopted and followed were appropriate . . . [and] that there is no genuine issue of a material fact as to the disinterestedness, independence and good faith of the Special Committee, or as to the scope of the investigation or the appropriateness of the procedures adopted and followed by the Special Committee in investigating the claims asserted. . . .

The Court of Appeals reversed, holding that "directors of North Carolina corporations who are parties to a derivative action may not confer upon a special committee of the board of directors the power to bind the corporation as to its conduct of the litigation." 72 N.C. App. at 547, 324 S.E. 2d at 886. In reaching this conclusion, the Court of Appeals considered each of three prevailing views, rejected both the view first articulated in the landmark case of *Auerbach v. Bennett*, 47 N.Y. 2d 619, 393 N.E. 2d 994, 419 N.Y.S. 2d 920 (1979), and the view as represented by *Zapata Corp. v. Maldonado*, 430 A. 2d 779 (Del. 1981), both of which recognize the authority of the courts to rely, with different degrees of deference, upon litigation decisions made by special litigation committees of the corporation's board of directors, and adopted the rule enunciated in *Miller v. Register And Tribune Syndicate, Inc.*, 336 N.W. 2d 709 (Iowa 1983).[3]

3. As of this date, it appears that the courts of only four states, Alabama, Delaware, Iowa and New York, have addressed the question presented here. New York and Alabama have adopted the rule known as the *Auerbach* rule, *Auerbach v. Bennett*, 47 N.Y. 2d 619, 393 N.E. 2d 994, 419 N.Y.S. 2d 920; *Roberts v. Alabama Power Co.*, 404 So. 2d 629 (Ala. 1981), Delaware adopted the rule as stated in

The claims made on behalf of certain minority shareholders of AAA were first asserted by letter dated 28 October 1981 from Attorney Thomas A. Lockhart and directed to the board of directors of All American Assurance Company. The letter questioned the propriety of certain transactions undertaken by the officers and directors of AAA in conducting business for the corporation. These included failing to exercise an option to purchase shares of AAA stock from Great Commonwealth Life Insurance Company (GCL) and failing to exercise a "put" to sell shares of AAA stock to American Commonwealth Financial Corporation (ACFC); paying excessive amounts to affiliated companies for administrative expenses; entering into certain allegedly improper reinsurance and coinsurance agreements; redeeming certain 8% debentures held by affiliated companies; releasing American Bank and Trust Company (ABTC) of Baton Rouge, Louisiana, from an obligation to purchase an office building; and engaging in other allegedly improper transactions with affiliates, including unsecured loans and joint ownership of airplanes.[4]

_____

*Zapata Corp. v. Maldonado*, 430 A. 2d 779, and Iowa adopted the rule of *Miller v. Register And Tribune Syndicate, Inc.*, 336 N.W. 2d 709. Most of the opinions which have considered application of the business judgment rule to decisions of special litigation committees have been by federal courts applying law which they predict would be applied by the state whose law governs the litigation. *Auerbach* has been applied as the law of California, *Gaines v. Haughton*, 645 F. 2d 761 (9th Cir. 1981), *cert. denied*, 454 U.S. 1145, 71 L.Ed. 2d 297 (1982), relying on *Lewis v. Anderson*, 615 F. 2d 778 (9th Cir. 1979), *cert. denied*, 449 U.S. 869, 66 L.Ed. 2d 89 (1980), and of Michigan, *Genzer v. Cunningham*, 498 F. Supp. 682 (E.D. Mich. 1980). Federal courts have applied *Zapata* as the projected law of Maryland, *Rosengarten v. Buckley*, 613 F. Supp. 1493 (D.C. Md. 1985), Virginia, *Abella v. Universal Leaf Tobacco Co., Inc.*, 546 F. Supp. 795 (E.D. Va. 1982) and Connecticut, *Joy v. North*, 692 F. 2d 880 (2d Cir. 1982), *cert. denied sub nom. Citytrust v. Joy*, 460 U.S. 1051, 75 L.Ed. 2d 930 (1983).

In two additional cases, the federal courts found it unnecessary to choose between *Auerbach* and *Zapata: In re General Tire & Rubber Co. Sec. Litigation*, 726 F. 2d 1075 (6th Cir.) (concluding that under either *Auerbach* or *Zapata*, the settlement decision of the committee would be affirmed; thus, no need to decide which Ohio would apply), *modified on other grounds*, Fed. Sec. L. Rep. (CCH) ¶ 91, 468, *cert. denied sub nom. Schreiber v. Gencorp, Inc.*, 469 U.S. 858, 83 L.Ed. 2d 120 (1984); *Hasan v. CleveTrust Realty Investors*, 729 F. 2d 372 (6th Cir. 1984) (under either *Auerbach* or *Zapata*, the thoroughness of the one-man committee's investigation as well as his disinterestedness would prevent entry of summary judgment; thus no need to decide which rule Massachusetts would apply).

4. Underlying these claims and the allegations in the derivative action is the fact that defendants Shaw, Rice, ICH, ACFC and GCL (the "Shaw Group") repre-

Alford v. Shaw

By letter dated 11 May 1982, Mr. Lockhart, as attorney for the minority shareholders of AAA, made the following demands of the board of directors with regard to the earlier claims: recovery from GCL of 232,678 AAA shares purchased at $5.00 per share when AAA had a "put" option to sell 51,774 shares at $10.00 per share to ACFC; recovery of all loans and advances to affiliates; recovery of all investments, amounting to at least $4,259,149.00, in National American Life Insurance Company (NAL); and demand that the company refrain from coinsurance and reinsurance treaties and transactions with affiliates which had not been approved by the North Carolina Department of Insurance.

sent the majority and controlling shareholders of AAA and that the transactions complained of allegedly amounted to a "pattern of self-dealing and negligent acquiescence" resulting in the "looting" of assets of AAA. The transactions for the most part can be traced to the corporate history of AAA:

AAA, a North Carolina corporation, was originally organized in 1929 as Pyramid Life Insurance Company, with offices in Charlotte, North Carolina. In 1972, control of the company was acquired by investors who changed the name to All American Assurance Company and moved the offices to Baton Rouge, Louisiana. In 1975, the company was placed in rehabilitation by the North Carolina Department of Insurance after encountering financial difficulties. Mr. Lockhart brought a derivative action on behalf of the company in 1976, charging improper handling of the company's operations. *See Swenson v. Thibaut*, 39 N.C. App. 77, 250 S.E. 2d 279 (1978), *disc. rev. denied and appeal dismissed*, 296 N.C. 740, 254 S.E. 2d 181-83 (1979). At that time, approximately 65% of the company's stock was owned by American Bank & Trust Company of Baton Rouge. On 5 January 1979, ABTC sold this stock to ACFC, a defendant in this action. ACFC was controlled by defendant ICH which in turn was controlled by defendants Shaw and Rice. ACFC then sold this stock to defendant GCL, its wholly-owned subsidiary. The offices of AAA were moved to Dallas, Texas where AAA shares common facilities and personnel with GCL and other affiliated companies under a cost sharing plan. AAA then formed NALICO in 1981. NALICO Insurance Company, a wholly-owned subsidiary of AAA, acquired all of the shares of National American Life Insurance Company (NAL). NAL, a Louisiana company, had been in both receivership and rehabilitation. NALICO was dissolved in December 1982. NAL is wholly-owned by AAA. In November 1982, the minority shareholders of all of the companies controlled by ICH, including AAA, were eliminated through a series of mergers and these companies became wholly-owned subsidiaries of ICH. The question of the merger was raised in the present lawsuit. Plaintiffs' motion for a preliminary injunction to stop the merger was denied on 17 November 1982 upon stipulation of defendants ICH, ACFC and GCL that they are subject to the jurisdiction of the court in this action; that plaintiffs would not lose their standing by virtue of the merger; that defendants would maintain the special litigation committee; and that the court would retain jurisdiction of the cause and the parties. The Committee concluded that the fraudulent merger claim involves individual shareholder rights rather than rights of AAA.

The complaint in the present action, filed on 4 November 1982, asserted liability on the part of the defendants based on the transactions described above and the failure of AAA's directors to take action.

B.

As one commentator recently noted, this case "clearly presents policy choices of major significance in the corporation law of North Carolina." R. Robinson, *North Carolina Corporation Law and Practice*, § 14-15 (3d ed. 1983 and Supp. 1985). We therefore deem it appropriate to approach the issue from a historical and economic as well as a legal perspective.

The shareholder derivative action, codified in N.C.G.S. § 55-55, traces its roots to English common law as first described in the case of *Foss v. Harbottle*, 2 Hare 461, 67 Eng. Rep. 189 (1843).

The Supreme Court of the United States, after a brief encounter with the propriety of derivative actions in *Dodge v. Woolsey*, 59 U.S. 331, 15 L.Ed. 401 (1855), fully recognized and set out the common law requirements for derivative actions in *Hawes v. Oakland*, 104 U.S. 450, 26 L.Ed. 827 (1882). With respect to the right of the shareholder to bring a derivative action, the Court observed:

> That the vast and increasing proportion of the active business of modern life which is done by corporations should call into exercise the beneficent powers and flexible methods of courts of equity, is neither to be wondered at nor regretted; and this is especially true of controversies growing out of the relations between the stockholder and the corporation of which he is a member. The exercise of this power in protecting the stockholder against the frauds of the governing body of directors or trustees, and in preventing their exercise, in the name of the corporation, of powers which are outside of their charters or articles of association, has been frequent, and is most beneficial, and is undisputed.

*Id.* at 453, 26 L.Ed. at 829.

A derivative action brought by the shareholder against the corporation and others for wrongdoing, however, was subject to two requirements: (1) an exhaustion of intra-corporate remedies,

and (2) ownership of shares in the corporation at the time of the complained-of transaction. In this regard, Justice Miller relied on the decisions of the English courts, quoting with approval *MacDougall v. Gardiner*, 1 Ch. D. 13 (1875):

> "[N]othing connected with internal disputes between shareholders is to be made the subject of a bill by some one shareholder on behalf of himself and others, unless there be something illegal, oppressive, or fraudulent; unless there is something *ultra vires* in the part of the company *qua* company, or on the part of the majority of the company, so that they are not fit persons to determine it, but that every litigation must be in the name of the company, if the company really desire it. Because there may be a great many wrongs committed in a company, — there may be claims against directors, there may be claims against officers, there may be claims against debtors; there may be a variety of things which a company may well be entitled to complain of, but which, as a matter of good sense, they do not think it right to make the subject of litigation; and it is the company, as a company, which has to determine whether it will make anything that is a wrong to the company a subject-matter of litigation, or whether it will take steps to prevent the wrong from being done."

*Id.* at 456-57, 26 L.Ed. at 830-31.

Although citing to and adopting the requirements for maintaining a derivative action enunciated in *Hawes v. Oakland*, the North Carolina Supreme Court in *Moore v. Mining Company*, 104 N.C. 534, 10 S.E. 679 (1889) first approached the derivative action with caution, reasoning that:

> In the nature of the matter it would contravene every principle of intelligent procedure, be impractical and absurd to allow ordinarily one or more of the stockholders of a corporation to bring actions to recover property, or the value of it, that belongs to it, or to recover damages for injuries to it, or its property, or to collect debts due to it. Such actions imply corporate disorganization and the absence of corporate integrity and entity. . . . The right to bring and the occasion of bringing such actions arises only when and because the proper corporate officers will not, for some *improper* con-

sideration, discharge their duties as they should do. But stockholders, as such, may not bring such actions at their pleasure . . . .

*Id.* at 542-43, 10 S.E. at 682. (Emphasis added.)

Since the decision in *Moore,* our courts have entertained shareholder derivative actions, subject to the requirements of exhaustion of intra-corporate remedies, including demand on directors, and contemporaneous ownership. *See Goodwin v. Whitener,* 262 N.C. 582, 138 S.E. 2d 232 (1964) (mismanagement); *Sales Corp. v. Townsend,* 248 N.C. 687, 104 S.E. 2d 826 (1958) (fraudulent withdrawal and appropriation of corporate assets); *Caldlaw, Inc. v. Caldwell,* 248 N.C. 235, 102 S.E. 2d 829 (1958) (preempting profit on sale of corporate property); *Jordan v. Hartness,* 230 N.C. 718, 55 S.E. 2d 484 (1949) (fraudulently dissipating assets).

## C.

Of particular significance in the development of the law concerning the shareholder derivative action are the early and thereafter consistent statements requiring prior demand on the directors of a corporation and a recognition of the necessity and validity of business judgment in conducting corporate affairs.

The rationale for the prerequisite of demand speaks to the essence of corporate governance. "When a person becomes a stockholder in a corporation he assents to the execution of all the powers which the law confers upon the corporation and agrees to abide by the action of the governing body as to all matters properly under its control." *Murphy v. Greensboro,* 190 N.C. 268, 275, 129 S.E. 614, 617 (1925); *see Hill v. Erwin Mills, Inc.,* 239 N.C. 437, 80 S.E. 2d 358 (1954). The directors are responsible for the total management of the corporation, including decisions to forego suits or pursue actions which in their judgment are in the best interests of the corporation. To require the shareholder to pursue and exhaust intra-corporate remedies through demand on directors assures corporate management the opportunity to pursue alternative remedies, thus avoiding unnecessary litigation. It is only in those cases where demand would be futile, as where corporate management is under control of the alleged guilty parties, that demand is excused. *See Gaines v. Manufacturing Co.,* 234 N.C. 331, 67 S.E. 2d 355 (1951) (a shareholder may show facts ex-

cusing demand); *Hill v. Erwin Mills, Inc.*, 239 N.C. 437, 80 S.E. 2d 358 (where control of a corporation is in the directors whose actions are questioned, and a minority shareholder has exhausted all means available to him to obtain redress of grievances within the corporation itself, demand is not required); *Excelsior Pebble Phosphate Co. v. Brown,* 74 F. 321, 323 (4th Cir. 1896) ("to require the complainants to show that they had exhaused all effort in inducing the directors to convict themselves of fraud, is absurd").

Viewed in historical perspective, the evolving law of shareholder derivative actions also presaged what is now referred to as the business judgment rule. In *Hawes v. Oakland,* 104 U.S. 450, 458, 26 L.E. 827, 831, the Court noted the important distinction between the class of cases involving directors who were allegedly guilty of fraud, breach of trust, or were proceeding *ultra vires,* and those cases "in which there is no breach of trust, but only error and misapprehension or simple negligence on the part of the directors."

We find similar language in our early case of *Besseliew v. Brown,* 177 N.C. 65, 97 S.E. 743 (1918). In the context of a suit by the receivers of a corporation against its officers and directors to recover loss of the company's assets, our Court affirmed a judgment overruling a demurrer from which defendants had appealed. Plaintiff alleged that the directors had negligently entrusted the management of corporate affairs to its secretary who misappropriated the company's funds. In determining the extent of defendants' liability this Court observed that:

> It is fully established in this jurisdiction and elsewhere that the directors and managing officers of a corporation are to be properly considered and dealt with as trustees, or *quasi* trustees, in respect to their corporate management, and may, in proper instances, be held liable for loss or depletion of the company's assets due to their willful or negligent failure to perform their official duties. *They are not, as a rule, responsible for mere errors of judgment (Fisher v. Fisher,* 170 N.C. 378, and authorities cited), nor for slight omissions from which the loss complained of could not have reasonably been expected; but where they accept these positions of trust they are expected and required to give them the care and attention that a prudent man should exercise in like circumstances

and charged with a like duty, usually the care that he shows in the conduct of his own affairs of a similar kind; and if there is a breach of legal duty in this respect, causing a loss of the company's assets, the corporation may sue . . . .

*Id.* at 67, 97 S.E. at 744. (Emphasis added.) *See also Gordon v. Pendleton*, 202 N.C. 241, 162 S.E. 546 (1932) (nonsuit for defendants affirmed—no convincing or satisfactory evidence that alleged negligent acts of defendants in making loans resulted in pecuniary loss).

Thus, in North Carolina as elsewhere, the business judgment rule has provided the yardstick against which the duties and decisions of corporate officers and directors are measured in order to achieve a balance between the need to hold management accountable for legitimate wrongs committed against the corporation and the need to ensure that management is accorded necessary decision-making discretion[5] and concomitant protection from liability for injury to the corporation resulting from good faith decisions undertaken within the scope of authority and with loyalty and due care.

As a defensive mechanism, the rule has spawned the business judgment doctrine that courts will not normally review or interfere with corporate management decisions, given "the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments." *Auerbach v. Bennett*, 47 N.Y. 2d at 630, 393 N.E. 2d at

---

5. Numerous salutary policy reasons for the rule include the belief that "after-the-fact litigation is an imperfect device to evaluate corporate business decisions," particularly where "[t]he entrepreneur's function is to encounter risks and to confront uncertainty." *Joy v. North*, 692 F. 2d at 886. That is, there is a need to protect management "from unfair retrospective reviews of their mistakes," thus permitting "risk-taking, innovation and venturesome business activity." Russell M. Robinson, II, *Recent Developments in the Business Judgment Rule*, Commercial, Banking & Business Law Section Annual Meeting and CLE program, N.C. Bar Foundation Continuing Legal Education (1986). Other reasons advanced include the recognition that directors are managers, not insurers of the corporation's success; management decisions are more properly the province of directors selected by shareholders rather than of a judge; and as a matter of judicial economy, the rule relieves the courts from involvement in complicated business questions. *See* Dent, *The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?*, 75 Nw. U.L. Rev. 96 (1980); Brown, *Shareholder Derivative Litigation and the Special Litigation Committee*, 43 U. Pitt. L. Rev. 601 (1982).

1000, 419 N.Y.S. 2d at 926. Thus, the decisions of directors are accorded a presumption of propriety which can be overcome only upon a showing of misconduct—lack of good faith, dishonesty, etc.

The applicability of the business judgment rule to a particular board decision, however, has not been limited to purely commercial business decisions; that is, as a substantive defense to shareholder attacks on the soundness of business decisions. Through an evolving line of judicial decisions, the rule has been applied to litigation decisions determining whether or not a corporation should pursue an available cause of action. *See United Copper Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 61 L.Ed. 1119 (1917); *Corbus v. Alaska Treadwell Gold Mining Co.*, 187 U.S. 455, 47 L.Ed. 256 (1903); *Hawes v. Oakland*, 104 U.S. 450, 26 L.Ed. 827. To the extent that the good faith and honesty requirements are met, a litigation decision not to sue made by disinterested board members has been accorded by courts the same presumption of propriety and judicial deference under the business judgment doctrine as decisions made regarding the day-to-day operation of the company. Unless the minority shareholders who institute a derivative suit can provide a forecast of evidence that the disinterested board either did not make the decision not to pursue the litigation in good faith or failed to conduct an adequate investigation of the claim before making the decision, summary judgment dismissing the action is appropriate.

The recognition by American courts that the business judgment rule may serve as a procedural tool to terminate derivative action has not been without controversy.[6] It is, nevertheless, the critical starting point toward resolution of the issue presented in this case.

---

6. *See generally* Coffee and Schwartz, *The Survival of the Derivative Suit: An Evaluation and a Proposal for Legislative Reform*, 81 Colum. L. Rev. 261 (1981). The authors question the relevance of the business judgment rule to decisions to terminate litigation given the policy of the rule to shield management from liability for decisions made in the context of the business environment. The pressures of time, the uncertainty of decisions where risk-taking is a factor, and the risk of liability inherent in business decisions do not accompany a decision not to sue.

## II.

### A.

We first note that "derivative claims . . . belong to the corporation itself," *Auerbach*, 47 N.Y. 2d at 631, 393 N.E. 2d at 1000, 419 N.Y.S. 2d at 927; that is, the rights to be vindicated are those of AAA, not those of plaintiffs suing derivatively on the corporation's behalf.[7] *See Gall v. Exxon Corp.*, 418 F. Supp. 508 (S.D.N.Y. 1976). With this in mind, courts have acknowledged that the decision whether to prosecute derivative claims generally lies within the judgment and control of management. In *United Copper Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263-64, 61 L.Ed. 1119, 1124, Justice Brandeis observed that:

> Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion *intra vires* the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment.

In *United Copper*, the issue was whether a court should entertain a shareholder's derivative suit brought on behalf of a corporation to recover damages against a third party for conduct in violation of the Sherman Act following the corporation's refusal to institute the suit. The Court acknowledged that there was no allegation of misconduct on the part of the directors or that the directors were in control of the wrongdoers or stood in any relation to them. The district court had sustained a demurrer and dismissed the complaint. Its judgment was affirmed by the Circuit Court of Appeals, and the Supreme Court affirmed.

---

7. N.C.G.S. § 55-55(d) provides that: "If the action on behalf of the corporation is successful, in whole or part, whether by means of a compromise and settlement or by a judgment, the court may award the plaintiff the reasonable expenses of maintaining the action, including reasonable attorneys' fees, and shall direct the plaintiff to account to the corporation for the remainder of any proceeds of the action."

The protective mantle of the business judgment rule to litigation decisions, while admittedly a barrier to shareholders seeking to assert a derivative action over board opposition, is not without rational basis. Indeed, assuming that a compensatory rationale underlies the derivative action, factors militating against even potentially successful litigation, such as the disruption of business, adverse impact on employee morale, and impact of adverse publicity, are considerations well within the expertise of corporate management. Frequently, derivative action is predicated on a multitude of complicated business transactions occurring over an extended period of time (as is the situation in the present case). The corporate cost of conducting such complex litigation is frequently formidable. *See, e.g., Gaines v. Haughton,* 645 F. 2d 761; *Cramer v. General Tel. & Electronics Corp.,* 582 F. 2d 259 (3d Cir. 1978), *cert. denied,* 439 U.S. 1129, 59 L.Ed. 2d 90 (1979); *Rosengarten v. Intern. Tel. & Tel. Corp.,* 466 F. Supp. 817 (S.D.N.Y. 1979); *Gall v. Exxon Corp.,* 418 F. Supp. 508. Thus, the decision whether and to what extent to prosecute is generally predicated on considerations which are ultimately calculated to protect and advance the economic best interest of the corporation, a responsibility which belongs to the management of the corporation.

In principle then we recognize that the decision of disinterested directors, made in good faith and in the exercise of honest judgment, not to pursue claims should be accorded judicial deference under the business judgment doctrine, thereby precluding judicial inquiry into the merits of such claims. *See Swenson v. Thibaut,* 39 N.C. App. 77, 250 S.E. 2d 279.

The business judgment rule, however, presupposes that management decisions have been made by disinterested and impartial board members acting honestly and in good faith, with loyalty and due care. Where shareholders' claims allege wrongdoing on the part of a majority of the officers or directors, as is the case in the present lawsuit, the practice has emerged of appointing a committee of directors, a special litigation committee not implicated in the wrongdoing, to assume responsibility for the litigation decision. Briefly, courts in other jurisdictions have adopted one of three approaches in according judicial deference to the decision of a special litigation committee. The so-called *Auerbach* view holds that the business judgment rule forecloses judicial in-

quiry into the merits of a shareholder derivative suit where the decision to terminate has been made by a committee of disinterested directors acting in good faith and following appropriate investigative procedures. *See Auerbach v. Bennett,* 47 N.Y. 2d 619, 393 N.E. 2d 994, 419 N.Y.S. 2d 920. The *Zapata* view essentially adopts the *Auerbach* position in cases where formal demand was made and acted upon by the special litigation committee; i.e., where a majority of the board of directors was not implicated in the charges of wrongdoing. A committee decision rejecting a derivative claim where demand was excused as being futile is subject to closer judicial scrutiny—a two-step test necessitating inquiry into the independence, good faith, and basis supporting the committee's conclusions as well as a determination by the court, applying its own independent judgment, whether the action should be dismissed. *See Zapata Corp. v. Maldonado,* 430 A. 2d 779. Finally, *Miller v. Register And Tribune Syndicate, Inc.,* 336 N.W. 2d 709 holds that directors who are parties to a derivative action may not confer upon a special litigation committee the power to bind the corporation as to its conduct of the litigation, a position taken only by the Iowa courts.[8]

B.

Inasmuch as we have recognized in principle that litigation decisions made by corporate management should be accorded judicial deference under the business judgment doctrine, the issue then becomes whether and to what extent the decisions of a special litigation committee should be recognized by our courts in North Carolina where the appointment of that committee is necessitated by allegations of misconduct on the part of a majority of the board of directors—misconduct which disqualifies the directors themselves from making an impartial litigation decision.

Clearly, there are fundamental differences between a litigation decision made by a board of directors free of implication in wrongdoing and by a special litigation committee appointed to make a litigation decision because charges of misconduct have been lodged against a majority of the board. In the former case, it

---

8. The same standard adopted by the Iowa Court was earlier adopted by a Delaware Chancery Court in 1980 and was later rejected by the Supreme Court of Delaware in the *Zapata* case. *See Maldonado v. Flynn,* 413 A. 2d 1251 (Del. Ch. 1980), *rev'd sub nom., Zapata Corp. v. Maldonado,* 430 A. 2d 779 (Del. 1981).

is only the interests of the corporation which are involved. The integrity of the board's decision-making process is intact. The decision of a special litigation committee, on the other hand, involves not only legitimate business judgments concerning the propriety of the suit as it pertains to the best interests of the corporation, but also exposure of board members to potential liability should the committee determine that derivative action is appropriate. As a result, a number of courts have questioned, with varying degrees of suspicion, the ability of special litigation committees to render dispassionate, unbiased decisions. *See Abramowitz v. Posner*, 513 F. Supp. 120 (S.D.N.Y. 1981), *aff'd*, 672 F. 2d 1025 (2d Cir. 1982); *Genzer v. Cunningham*, 498 F. Supp. 682; *Zapata Corp. v. Maldonado*, 430 A. 2d 779.

The assumption is that the taint of self-interest which disqualifies directors in the first instance from rendering an impartial litigation decision should act to disqualify the same defendant directors from participating in the selection of a committee authorized to make the decision. That is, personal, financial and moral influences — peer or "structural" bias — will permeate the committee's decision-making process and ultimately compromise its integrity.

This potential for "structural bias" was evidently of sufficient concern to the Court of Appeals in this case to justify the adoption of a prophylactic rule effectively prohibiting the power of a "tainted" board to delegate a litigation decision to a special litigation committee. *Alford v. Shaw*, 72 N.C. App. at 544-45, 324 S.E. 2d at 884. In so holding, the Court of Appeals has, as defendants point out, virtually emasculated the corporation's power to terminate derivative litigation where all or a majority of directors are named as defendants. We do not believe that the prophylactic rule adopted by the Court of Appeals, as enunciated in *Miller v. Register And Tribune Syndicate, Inc.*, 336 N.W. 2d 709, will serve the best interests of all segments of the corporate community in North Carolina, including minority stockholders, majority stockholders, officers, directors and the corporate entity.

In rejecting the *per se* rule prohibiting disqualified directors from delegating litigation decisions to a special litigation committee, we must determine the amount of judicial deference to be accorded to the decision of the committee.

The following observations, made by one commentator, offer perhaps the most thoughtful perspective on the dilemma of shareholder derivative litigation as evidence in this case:

> The quintessential characteristic of corporate governance is private decision-making by directors as the appointed delegates of shareholders. Shareholders commit themselves to having their commercial affairs controlled by a board of directors when they make the decision to put their investment capital at risk in a corporation. In instituting derivative actions, shareholders seek to be released from this commitment which they have made to rule by directors. Shareholders are attempting to substitute their litigation decisions for those of their directors. This is the dilemma which shareholders derivative litigation presents to the courts. By entertaining such litigation, courts are required to sanction a fundamental change in the most basic of intra-corporate relationships. Derivative litigation is predicated upon the willingness of the court to reverse the roles of the directors and shareholders in corporate decision-making. Many of the problems encountered by the courts in dealing with special litigation committees arise from the irreconcilability of this concept of shareholder derivative litigation and the traditional concept of autonomous corporate governance by the board of directors. The courts wish to accommodate meritorious derivative litigation while at the same time preserving, to the greatest extent possible, the traditional intra-corporate relationship between shareholders and directors.
>
> When the full board is disabled from acting because of majority member disqualification, the special litigation committee makes use of outside directors as the only viable group within the corporate entity potentially capable of performing the board's traditional role of corporate decision-maker. The very willingness of the courts to listen to a special committee is a judicial acknowledgment of the proven value of traditional corporate norms which recognize private decision-making by directors as the most effective method of corporate governance. The private corporation has been the primary instrument for this country's development of a business infrastructure which, at least in comparison with the

systems of other countries, has been remarkably successful in producing an economy of abundance.

Brown, 43 U. Pitt. L. Rev. at 644.

With this in mind, we also take judicial notice of the fact that North Carolina has grown in recent years to become one of the most populous states in the nation. Commerce and industry have enjoyed a concomitant growth in the state and depend for their strength and vitality on laws designed to encourage and protect that growth. *See, e.g., A.E.P. Industries v. McClure,* 308 N.C. 393, 302 S.E. 2d 754 (1983); North Carolina Economic Development Report, North Carolina Department of Commerce (1985). A favorable business climate can be fostered in part by recognizing the importance of traditional intra-corporate relationships, and by providing a measure of protection against "strike suits" (nuisance suits brought to extort settlement).[9]

We are not unmindful of the criticisms advanced by commentators and courts respecting the full breadth of judicial deference accorded special litigation committee decisions under the business judgment doctrine. *See* Cox, *Searching for the Corporation's Voice in Derivative Suit Litigation: A Critique of Zapata and the ALI Project,* 1982 Duke L.J. 959; Coffee and Schwartz, *The Survival of the Derivative Suit: An Evaluation and Proposal for Legislative Reform,* 81 Colum. L. Rev. 261; Brown, *Shareholder Derivative Litigation and the Special Litigation Committee,* 43 U. Pitt. L. Rev. 601; Dent, *The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit,* 75 Nw. U.L. Rev. 96.

Of particular interest to us is the view expressed in *Zapata Corp. v. Maldonado,* 430 A. 2d 779, which purports to represent a compromise position between the judicial deference advocates and the prophylactic rule advocates. We find, however, that the

---

9. In this regard it should be noted that N.C.G.S. § 55-55(c) provides that the derivative action, once brought, may not be dismissed, discontinued, compromised or settled without approval of the court, thereby substantially reducing the potential for extortion of settlement. N.C.G.S. § 55-55(c) provides that in the event the court determines that the derivative action was brought without reasonable cause, the court may require the plaintiff to pay defendant directors or officers the reasonable expenses of defending the action, including attorneys' fees. The provision offers additional protection against the bringing of nuisance suits.

*Zapata* court, in advancing the two-tiered analysis, provides only "an illusory improvement," Cox, 1982 Duke L.J. 975; potentially raises more problems than it offers solutions, *see Joy v. North*, 692 F. 2d 880 (Cardamone, J. dissenting); and in the absence of standards or guidelines for the rendering of a court's own independent judgment, offers no assurance that decisions will be consistent. *See* Brown, 43 U. Pitt. L. Rev. at 642-43. Thus "[i]n the absence of well-articulated standards, any power to decide may quickly degenerate into the power to decide arbitrarily." *Id.* at 643-44. More important, however, is our rejection of the predisposed prejudice on the part of some courts that a special litigation committee is, due to the potential of some inherent structural bias, incapable of acting independently. Finally, we fail to find authority in our Rules of Civil Procedure or elsewhere for a trial judge in North Carolina to substitute his own judgment for that of the factfinder in determining whether the decision to terminate litigation is appropriate if the circumstances do not justify deference to the decision of duly elected corporate directors.

## C.

[1]    We have chosen to adopt the business judgment rule position enunciated in *Auerbach v. Bennett*, 47 N.Y. 2d 619, 393 N.E. 2d 994, 419 N.Y.S. 2d 920, which limits judicial inquiry into a special litigation committee's judgment regarding whether it is in the best interests of a corporation to pursue litigation to whether the committee was composed of disinterested, independent directors who acted in good faith, following appropriate investigative procedures, but we modify the traditional *Auerbach* approach regarding the allocation of the burden of proof. We believe that careful application of this modified *Auerbach* rule to determine the disinterested independence and good faith of the committee members and the appropriateness and sufficiency of the investigative procedures provides sufficient judicial safeguards. With that inquiry satisfied, our courts should recognize that the substantive decision of the committee not to pursue the claims advanced in the shareholder's derivative action "falls squarely within the embrace of the business judgment doctrine, involving as it [does] the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution

of many if not most corporate problems."[10] *Auerbach*, 47 N.Y. 2d at 633, 393 N.E. 2d at 1002, 419 N.Y.S. 2d at 928.

In adopting the *Auerbach* rule, we first note, as did the Court of Appeals, that it is within the power of boards of directors of North Carolina corporations to appoint committees from among their members to exercise full board authority. The committee must be approved by a majority of the board of directors then in office and must consist of two or more directors. N.C.G.S. § 55-31. The fact that the appointing members of a board of directors are acting under the "disability" of potential liability as a result of shareholder allegations does not *per se* extend to disable them from delegating managerial authority over the litigation to a special litigation committee.

Although rejecting a rule that the mere potential for structural bias conclusively prevents the application of the business judgment doctrine to a litigation decision made by a special litigation committee when a majority of the members of the board of directors of the corporation are accused in a derivative action of misconduct, we nevertheless recognize the legitimate concern regarding the true independence of such a committee. Under these circumstances we believe that at a hearing on a motion for summary judgment, the burden of establishing that the committee was composed of directors who were disinterested and independent and who conducted an appropriately thorough investigation should be upon the defendants to the derivative action.[11] The de-

---

10. A decision not to pursue litigation is not necessarily a decision that the claim lacks merit. The costs to the corporation, both direct and indirect, of litigation may outweigh the benefit to the corporation of even successful litigation. *See Rosengarten v. Intern. Tel. & Tel. Corp.*, 466 F. Supp. 817, 824 ("If the directors legitimately determine that such an action will not benefit the corporation, then, regardless of the illegality of the underlying transaction, the business judgment rule permits termination of the suit."); *see also Gall v. Exxon Corp.*, 418 F. Supp. 508.

11. It is also generally agreed that the burden of proof should be accorded to the party having better access to the relevant facts. *See McCormick on Evidence* § 337 (3d ed. 1984); 9 *J. Wigmore, Evidence* § 2486 (Chadbourn rev. 1981). In the present case, matters concerning the independence and investigative procedures of the special litigation committee clearly fall within the knowledge of the committee members and defendant directors who, additionally, possess the greater resources and are essentially contending that "the more unusual event has occurred." *McCormick* § 337 at 950.

fendants may not rely on the absence of evidence of a lack of independence and reasonable investigation; they must come forward with positive, uncontradicted and credible evidence that those prerequisites to reliance on the committee's decision are met. If the defendants fail to satisfy the trial judge that there is no genuine issue of material fact as to the satisfaction of those prerequisites, summary judgment may not be entered for the defendants. As we said in *Kidd v. Early*, 289 N.C. 343, 370, 222 S.E. 2d 392, 410 (1976) regarding the authority of the courts to enter summary judgment in favor of the party with the burden of proof:

> To be entitled to summary judgment the movant must still succeed on the basis of his own materials. He must show that there are no genuine issues of fact; that there are no gaps in his proof; that no inferences inconsistent with his recovery arise from his evidence; and that there is no standard that must be applied to the facts by the jury. Further, if the affidavits seem inherently incredible; if the circumstances themselves are suspect; or if the need for cross-examination appears, the court is free to deny the summary judgment motion.

If, however, the independence of the directors and the reasonableness of their investigation is established, the directors' good faith in carrying out their duties will be presumed in the absence of evidence to the contrary.[12]

### D.

[2]  With this standard in mind, we hold that the trial court properly granted defendants' motions for summary judgment.

The record discloses that the Board of Directors of AAA made every effort to insure that outside counsel and the two outside directors comprising the Committee met the requisite qualifications of independence and disinterestedness. The selection procedures and qualifications of the special litigation committee

---

12. Although this presumption places upon the plaintiffs in the derivative action the burden of producing evidence or going forward on the question of good faith, it does not shift to them the burden of persuasion. *See* 2 *Brandis on North Carolina Evidence* § 218 (1982). Therefore, if credible evidence of a lack of good faith by members of the Committee is produced at the hearing on the summary judgment motion, ordinarily summary judgment would be inappropriate.

members shown by the evidence presented in the present case are typical of an emerging pattern of common criteria designed to ensure independence and good faith and to engender confidence in the committee's ability to render sophisticated and impartial decisions in matters of legal and corporate business complexity. In this case, the Board began with its 10 June 1982 resolution to appoint Mr. Walter F. Brinkley as special counsel. Mr. Brinkley has served as President of the North Carolina Bar Association; is a member of the American College of Trial Lawyers; has experience in corporate, insurance and litigation matters; had previous experience as special counsel; and had never represented AAA or any of its affiliates. None of these facts is contested.

Mr. Brinkley was requested to contact and recommend two persons of "unquestioned reputation, experience, independence, ability and who [had] never been associated in any way with the Company or any of its affiliates" to serve as members of the board of directors and to act as a special litigation committee.

On 9 July 1982, Mr. Brinkley advised the Board by letter that he recommended Marion G. Follin, who was experienced as an executive in the operation of a life insurance company, and Frank M. Parker, who had judicial experience, to serve as the special litigation committee. Mr. Follin retired in 1970 from Pilot Life Insurance Company as Vice Chairman of the Board of Directors and Senior Vice President, as well as Vice President of three subsidiaries. Mr. Follin had been involved in the life insurance business for 40 years and had served with the U.S. Bankruptcy Court as an advisor and trustee. Judge Parker was a practicing attorney in North Carolina for thirty-two years during which time he also served as a member of the Board of Trustees for the University of North Carolina and was a member of the North Carolina Senate. Judge Parker served as an Associate Judge on the North Carolina Court of Appeals for twelve years and at the time of his appointment to the special litigation committee was serving of counsel to the law firm in which he was a partner prior to his judicial appointment. Again, none of these facts is contested. Plaintiffs have not challenged the independence of the committee except through general, broad allegations of structural bias.

At the 21 July 1982 meeting of the board of directors of AAA, Mr. Follin and Judge Parker were duly elected to the

Board. At that meeting, Judge Parker made the following statement which he requested be incorporated into the minutes:

> Speaking for Mr. Follin and myself, should you decide to elect us to the Board of Directors and to name us as the members of a Special Investigative Committee, we will accept the appointment provided that it is clearly understood that in undertaking our duties:
>
> (1) We have no preconceived ideas concerning the merits of any claims which may have been asserted or may in the future be asserted against All American Assurance Company or any of its present or former officers or directors;
>
> (2) We will conduct as thorough investigation [sic] as we possibly can make of all matters pertinent to such claims;
>
> (3) Based on the information developed as a result of our investigation and the facts as we find them to be, we will make our own independent determination as to what actions, if any, should be undertaken with respect to these claims in the best interest of all shareholders of All American Assurance Company; and
>
> (4) If after our investigation we determine, in our independent judgment, that some legal action or actions should, to protect the best interest of all shareholders, be undertaken against any person or entity, we will see that such actions are initiated and prosecuted vigorously to a conclusion.
>
> In short, we want it clearly understood that in carrying out our duties as members of the Board of Directors and as members of the Special Investigative Committee, we intend to exercise our own independent judgments and to let the chips fall where they may.

Neither the federal class action suit nor the derivative suit had been filed at the time of the appointments.

---

Alford v. Shaw

---

With respect to the investigative procedures, the committee interviewed sixteen people,[13] reviewed approximately 3,750 documents,[14] submitted interrogatories to each person who served as a director of AAA during the relevant period, and prepared a 409 page report in addition to an appendix which included twenty-five exhibits.

We note that in plaintiffs' Objection to AAA's Motion for Partial Summary Judgment and Approval of Proposed Settlement, plaintiffs' counsel alleges that the findings and conclusions of the Committee report were based on "many misrepresentations of facts and law made by defendants." In support of this allegation, plaintiffs included the affidavit of Buist M. Anderson, an attorney and fifty-year veteran in the life insurance industry. Mr. Anderson states that he examined the Committee report. Based only upon his review of the report, he concluded that "it appears that the Committee did not fully examine and evaluate all available information pertinent to plaintiffs' claims and that the Committee relied in large part upon misleading and false information provided by defendants." However, Mr. Anderson does not identify any information that was available and not examined or any lead that was not followed. Nowhere in the affidavit does Mr. Anderson specify any facts which he identifies as false; instead he states that the Committee relied upon certain "contentions" or "representations" made by the defendants which were erroneous or questionable.[15] In short, Mr. Anderson challenges, on their

---

13. Interviewed were members of the board of directors, three individuals from the North Carolina Department of Insurance, including the Insurance Commissioner; the Deputy Commissioner and Chief Examiner of the Louisiana Insurance Department; a representative from Coopers & Lybrand (auditors); a representative from Shearson/American Express; and attorneys, representing the minority shareholders.

14. Documents included organizational documents and all minutes of AAA; annual statements filed with insurance departments; SEC reports; proxy and financial statements; copies of correspondence, notes and memoranda; and minutes of affiliated companies.

15. In his affidavit Mr. Anderson states:

"Defendants' contention relied upon by AAA's Board and the Special Committee that AAA was not damaged in connection with the release of ABTC because AAA would have incurred a substantial capital gains tax upon sale of the building is erroneous . . . .

". . . .

merits, the propriety of the business transactions claimed by plaintiffs to be wrongful, unlawful and fraudulent, and questions the analysis of the special litigation committee which concluded that the transactions were based on legitimate business and tax consequences. Because Mr. Anderson's affidavit contains a challenge to the Committee's judgment, not to its independence or good faith, and does not suggest any available information which the Committee did not consider, it raises no question regarding issues which we have said are appropriate for determination of the ruling on the motion for summary judgment. It is also evident that plaintiffs' counsel, Mr. Lockhart, was afforded every opportunity to provide the Committee with information which might have been helpful in assessing the merits of the claims. This Mr. Lockhart declined to do.[16] The facts concerning what the Committee did in the process of its investigation are not in dispute. We hold that, when there is no factual dispute, the question of whether those facts establish that the investigation has been sufficiently thorough is a question to be determined as a matter of law by the courts. The Report of the Special Committee of All American Assurance Company, July 1983, leaves no doubt that the investigation was exhaustive and undertaken seriously and in good faith, following procedures sufficiently broad in scope and conscientious in execution to insure a thorough review of all allegations

---

"Defendants' representation that National American qualified as a 'dividend-paying' stock is clearly ludicrous . . . .

". . . .

"The representation by the Shaw group, relied on by AAA's Board and the Committee, that National American is a profitable investment for AAA is questionable . . . ."

16. It was counsel's position that the Committee should "share" information concerning its activities or investigation, rather than act as "judge and jury" and only receive information. In response, the Committee informed counsel that they did not feel that it was appropriate for him to interrogate members of the Committee as to their findings "since it was felt that the committee's function [was] to develop evidence and make its conclusions based upon the evidence which is discovered and considered."

By approving the entry of summary judgment in this case, we do not suggest that a plaintiff is not entitled to discover information relevant to the determination of the appropriateness of summary judgment. However, civil discovery procedures are available for that purpose and, of course, are limited to and afford the usual protections relating to relevancy and protection of work product.

and related matters. The Report supports a conclusion that the members were fully apprised of the facts which could support their decision to terminate the derivative action with respect to the majority of the claims.

In the present case we agree with the trial judge that the *Auerbach* test has been met with regard to the disinterested independence and good faith of the special litigation committee's membership and the nature and scope of its investigations and that the entry of partial summary judgment and approval of settlement[17] on behalf of AAA, and entry of summary judgment on behalf of defendants Wiley, Campisi, Hurst, Broussard, Black and Cox was proper.

Reversed and remanded.

Justice FRYE concurring in part and dissenting in part.

I concur in that portion of the majority opinion which holds that a special litigation committee is an appropriate device under the facts of this case. I dissent from that portion which adopts a modified version of the *Auerbach* rule. I believe that adopting a version of the *Zapata* rule would be more consistent with existing North Carolina statutory and case law.

This case raises serious questions concerning the continued vitality of shareholders derivative actions in North Carolina where the essence of the claim is alleged fraud and self-dealing by a majority of the members of the Board of Directors. Since the use of the special litigation committee under these circumstances presents a question of first impression before this Court, I believe that a good starting point for analysis is N.C.G.S. § 55-55, enacted by our General Assembly in 1973. This statute authorizes the initiation of shareholders derivative actions and provides for certain

---

17. Inasmuch as we have held that the decision of the special litigation committee with respect to plaintiffs' claims is governed by the business judgment rule, the proposed settlement of two claims, like the decision not to pursue litigation on the remaining claims, must be judged by the business judgment standard. Indeed, the fact that the Committee found sufficient merit in these two claims to recommend action speaks to its independence and the thoroughness of its investigation. Having determined that defendants met their burden under the *Auerbach* test, the judgment of the court extends to all recommendations made by the Committee, including recommendations to pursue or discontinue litigation or to settle claims.

control by the court and the award of reasonable expenses, including attorneys' fees to the plaintiffs or the defendants under certain circumstances. Subsection (c) is of special significance. It provides:

> (c) *Such action shall not be discontinued, dismissed, compromised or settled without the approval of the court.* If the court shall determine that the interest of the shareholders or any class or classes thereof, or of the creditors of the corporation, will be substantially affected by such discontinuance, dismissal, compromise or settlement, the court, in its discretion, may direct that notice, by publication or otherwise, shall be given to such shareholders or creditors whose interests it determines will be so affected. If notice is so directed to be given, the court may determine which one or more of the parties to the action shall bear the expense of giving the same, in such amount as the court shall determine and find to be reasonable in the circumstances, and the amount of such expense shall be awarded as costs of the action. (Emphasis added.)

The statute does not specifically say what test the court will apply in determining whether it will approve a discontinuance, dismissal, compromise or settlement of the action. However, it would be difficult for the court to make a determination as to whether the interests of the shareholders or the creditors would be substantially affected by such discontinuance, dismissal, compromise or settlement without at least looking at the proposed action substantively. One way would be to look at the plaintiff's claim to see if there is some forecast of evidence that would make it likely that the plaintiff could prevail on the merits. Even if there is a likelihood that the plaintiff could prevail but that the amount of the recovery would not be sufficient to outweigh the detriment to the corporation, the court could still allow discontinuance, dismissal, compromise or settlement. In making this determination, the court could rely heavily on the recommendation of the special litigation committee but without that recommendation being mandatory on the court.

Even in cases where the directors are not charged with fraud or self-dealing, and even if the plaintiff and the board agree to discontinue, dismiss, compromise or settle the lawsuit, they must

still get court approval. Thus, if we allow a special litigation committee's recommendation to be binding upon the court where the majority of the board which appointed the committee has been charged with fraud and self-dealing, we are giving to the special committee's recommendation a higher degree of sanctity than that which would be given to the combined recommendation of the plaintiffs and a board not charged with fraud or self-dealing. I do not believe that this was the intent of the legislature in enacting N.C.G.S. § 55-55.

Another expression of legislative intent may be found in N.C.G.S. § 55-30 relating to a director's adverse interest. It provides, *inter alia,*

(b) No corporate transaction in which a director has an adverse interest is either void or voidable, if:

. . . .

(3) The adversely interested party proves that the transaction was just and reasonable to the corporation at the time when entered into or approved. In the case of compensation paid or voted for services of a director as director or as officer or employee the standard of what is 'just and reasonable' is what would be paid for such services at arm's length under competitive conditions.

In *Smith v. Robinson,* 343 F. 2d 793 (4th Cir. 1965), it was stated that a corporate officer acts in a fiduciary capacity and cannot profit at the expense of the corporation; and that while it is true that the North Carolina law and the general law do not prohibit corporate officers from dealing with the corporation, the adversely interested party must prove that the transaction was fair, just and reasonable when entered into.

In 1927, this Court decided that a transaction between a corporation and its directors or officers is presumed to be invalid unless those seeking to sustain it prove that it was just and reasonable. *Highland Cotton Mills v. Ragan Knitting Co.,* 194 N.C. 80, 138 S.E. 428 (1927).

In *Meiselman v. Meiselman,* 309 N.C. 279, 307 S.E. 2d 551 (1983), this Court held that the common law rule as stated in *Highland Cotton Mills* is the same standard codified by the legis-

lature in N.C.G.S. § 55-30(b)(3). We said that under both standards the adversely interested party must demonstrate that the transaction at issue was "just and reasonable."

When N.C.G.S. §§ 55-55 and 55-30(b)(3) are read *in pari materia*, it would seem that when a stockholder in a derivative action seeks to establish self-dealing on the part of a majority of the board, the burden should be upon those directors to establish that the transactions complained of were just and reasonable to the corporation at the time when entered into or approved. The fact that a special litigation committee appointed by those directors charged with self-dealing recommends that the action should not proceed, while carrying weight, should not be binding upon the trial court. Rather, the court must make a fair assessment of the report of the special committee at least to determine whether there is some reasonable probability that the defendants will be able to show that the transaction was just and reasonable to the corporation at the time. If this appears evident from the report, then summary judgment may be allowed in favor of the defendants. If not, the court could still examine the report further to determine whether, notwithstanding the ability of the defendants to prove that the transaction was just and reasonable, it would still not be in the best interest of the corporation to pursue the derivative action.

In the instant case, the trial court was

> of the opinion that the business judgment rule controls the disposition of this case and, therefore, that *the only issues before it are whether the Special Committee was composed of disinterested, independent directors who acted in good faith, and whether the scope of the investigation and the procedures adopted and followed were appropriate*. (Emphasis added.)

Under *Zapata*, an additional requirement must be satisfied. The trial court must also exercise its independent discretion in determining whether it "will be persuaded by the exercise of a committee power resulting in a summary motion for dismissal . . . ." *Zapata Corp. v. Maldonado*, 430 A. 2d 779, 788 (Del. 1981). This the trial court clearly did not do. Thus, I would remand the case for the trial court to exercise its discretion in accordance with the *Zapata* rule.

Justice MARTIN dissenting.

The Court today has placed the corporate fox in charge of the shareholders' henhouse. As stated by the Supreme Court of Delaware:

> At the risk of stating the obvious, the problem is relatively simple. If, on the one hand, corporations can consistently wrest bona fide derivative actions away from well-meaning derivative plaintiffs through the use of the committee mechanism, the derivative suit will lose much, if not all, of its generally-recognized effectiveness as an intra-corporate means of policing boards of directors. See Dent, [*The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?*], 75 Nw. U.L. Rev. at 96 & n. 3, 144 & n. 241. If, on the other hand, corporations are unable to rid themselves of meritless or harmful litigation and strike suits, the derivative action, created to benefit the corporation, will produce the opposite, unintended result. For a discussion of strike suits, see Dent, *supra*, 75 Nw. U.L. Rev. at 137. See also *Cramer v. General Telephone & Electronics Corp.*, 3d Cir., 582 F. 2d 259, 275 (1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed. 2d 90 (1979). It thus appears desirable to us to find a balancing point where bona fide stockholder power to bring corporate causes of action cannot be unfairly trampled on by the board of directors, but the corporation can rid itself of detrimental litigation.

*Zapata Corp. v. Maldonado*, 430 A. 2d 779, 786-87 (1981). *Accord, e.g., Lewis v. Fuqua*, 502 A. 2d 962 (Del. Ch. 1985), *appeal refused*, 504 A. 2d 571 (Del. 1986). *See Abella v. Universal Leaf Tobacco Co.*, 546 F. Supp. 795 (E.D. Va. 1982). In my opinion, the majority's rejection of a standard acknowledging the existence of structural bias because of its concern to "serve the best interests of all segments of the corporate community in North Carolina" (slip op. at 24) does so at the expense of the bona fide rights of well-meaning stockholder-plaintiffs. What is needed instead is a fair procedure which will protect the interests of both the corporation and of shareholders who seek to protect their own economic interests by bringing suit on behalf of the corporation. It is not for this Court to "serve the best interests of all segments of the corporate community in North Carolina" — a function perhaps proper-

ly performed by the governor and General Assembly — but to en-
sure that conflicts among litigants are fairly adjudicated in a way
favoring neither "the corporate community" nor any other
association or person bringing suits before this Court.

The majority's adoption of the *Auerbach* standard mirrors
those opinions

> characterized both by insufficient attention to the commercial
> considerations which justify the business judgment rule's ap-
> plication in general business transactions and by a marked in-
> sensitivity to the threat of structural bias. Courts persuaded
> by *Auerbach's* articulation of the limited judicial review nec-
> essary in special litigation committee cases have in effect an-
> nounced a substantial presumption that the committee has
> acted properly, so that its recommendation can be over-
> turned only in extreme situations.

Cox & Munsinger, *Bias in the Boardroom: Psychological Founda-
tions and Legal Implications of Corporate Cohesion,* 48 Law and
Contemporary Problems, Summer 1985, at 83, 115-16, 126 (1985)
(footnotes omitted) [hereinafter *Bias in the Boardroom*]. *Cf., e.g.,
Hasan v. CleveTrust Realty Investors,* 729 F. 2d 372, 376 (6th Cir.
1984). Enlightened courts do not need blindly to defer to the
"business judgment rule." *See, e.g., Smith v. Van Gorkom,* 488 A.
2d 858 (Del. 1985); Note, *Directors Who Approve Sale of Corpora-
tion Without Sufficient Deliberation Not Entitled to Protection
Afforded by Business Judgment Rule,* 16 Seton Hall L. Rev. 242
(1986).

As at least one commentator has acknowledged, North Caro-
lina accords even minority shareholders unusually strong protec-
tion. *See* R. Robinson, *North Carolina Corporation Law* § 14-1
(1983). It is therefore appropriate to begin by observing that our
legislature has mandated that a shareholder's derivative action

> shall not be discontinued, dismissed, compromised or settled
> without the approval of the court. If the court shall deter-
> mine that the interest of the shareholders or any class or
> classes thereof, or of the creditors of the corporation, will be
> substantially affected by such discontinuance, dismissal, com-
> promise or settlement, the court, in its discretion, may direct
> that notice, by publication or otherwise, shall be given to

such shareholders or creditors whose interests it determines will be so affected. If notice is so directed to be given, the court may determine which one or more of the parties to the action shall bear the expense of giving the same, in such amount as the court shall determine and find to be reasonable in the circumstances, and the amount of such expense shall be awarded as costs of the action.

N.C.G.S. § 55-55(c) (1982).[1] This statute is a clear instantiation of the public policy of our state requiring thorough judicial review of suits initiated by shareholders on behalf of a corporation: under its plain language the court is directed to determine whether the interest of any shareholder will be substantially affected by the discontinuance, dismissal, compromise, or settlement of a derivative suit. This is also in accord with Rule 23(c) of the North Carolina Rules of Civil Procedure. In order to make such an assessment the court must of necessity evaluate the adequacy of materials prepared by the corporation which support the corporation's desire to dismiss or settle a derivative suit. To rely blindly on the report of a corporation-appointed committee which assembled such materials on behalf of the corporation—as the majority of this Court would do by adopting an *Auerbach*-type rule—is to abdicate the judicial duty to consider the interests of shareholders imposed by N.C.G.S. § 55-55(c). This abdication is particularly inappropriate in a case such as this one, where shareholders allege serious breaches of fiduciary duties owed to them by the directors controlling the corporation.

Since *Zapata Corp. v. Maldonado*, 430 A. 2d 779, was handed down in May 1981 the trend among courts which have been faced with the choice of applying an *Auerbach*-type rule or a *Zapata*-type rule clearly has been to require judicial scrutiny of the merits of the report of a special litigation committee. *Compare In re General Tire & Rubber Co. Sec. Litigation*, 726 F. 2d 1075 (6th Cir.), *modified on other grounds*, Fed. Sec. L. Rep. ¶ 91,468, *cert. denied*, 469 U.S. 858, 83 L.Ed. 2d 120 (1984); *Abramowitz v. Posner*, 672 F. 2d 1025 (2d Cir. 1982) (Delaware law); *Joy v. North*, 692 F. 2d 880, 889 (2d Cir. 1982) (Connecticut law; rejecting *Auer-*

---

1. Although the majority recognizes this statute in a footnote, no attempt is made to reconcile the duties imposed upon the trial court by the statute with the majority's analysis.

*bach* rule because it "effectively eliminate[s] the fiduciary obligations of directors and officers"), *cert. denied*, 460 U.S. 1051, 75 L.Ed. 2d 930 (1983); *Rosengarten v. Buckley*, 613 F. Supp. 1493, 1500 (D.C. Md. 1985) (applying Maryland law, the court stated that it "agrees with [the] commentators [who] have found fault with the *Auerbach* approach because it does not acknowledge the structural bias inherent in a system which allows directors to judge the actions of their fellow directors"); *Abella v. Universal Leaf Tobacco Co.*, 546 F. Supp. 795 (Virginia law); *Zilker v. Klein*, 540 F. Supp. 1196 (N.D. Ill. 1982) (indicating in dictum that court would have followed *Zapata* rule had parties not settled); *Miller v. Register and Tribune Syndicate, Inc.*, 336 N.W. 2d 709 (Iowa 1983), *with Gaines v. Haughton*, 645 F. 2d 761 (9th Cir. 1981) *cert. denied*, 454 U.S. 1145, 71 L.Ed. 2d 297 (1982) (relying on *Lewis v. Anderson*, 615 F. 2d 778 (9th Cir. 1979), *cert. denied*, 449 U.S. 869, 66 L.Ed. 2d 89 (1980), a case which, interpreting California law, noted similarity between Delaware and California statutes and followed *Auerbach*-type rule enunciated in pre-*Zapata* federal case construing Delaware law); *Roberts v. Alabama Power Co.*, 404 So. 2d 629 (Ala. 1981). I interpret this trend away from *Auerbach* as indicating growing concern ·with the deficiencies inherent in a rule giving great deference to the decisions of a corporate committee whose institutional symbiosis with the corporation necessarily affects its ability to render a decision that fairly considers the interest of plaintiffs forced to bring suit on behalf of the corporation.

The majority's shift of the burden of proving on summary judgment[2] that an executive "committee was composed of directors who were disinterested and independent and who conducted an appropriately thorough investigation" to the defendants to a derivative action is a step in the right direction. However, the majority's shift of this burden only when a *majority* of the members of the board of directors of the corporation are accused of misconduct hardly goes far enough. It would be a rare occasion that a majority of a board would be so accused. Moreover, what the majority concedes with one hand it takes away by the other by adding to this *Auerbach* test an unwarranted presumption. Until today, no court has ever gone so far as to add a presumption of

---

2. The majority's opinion does not make clear whether this burden would also shift at trial on the merits.

good faith to the *Auerbach* test "[i]f . . . the independence of the directors and the reasonableness of their investigation is established." As the United States Court of Appeals for the Sixth Circuit stated when overruling a district court order which applied such a presumption:

> Neither the *Auerbach* approach nor the *Zapata* approach allows a reviewing court to extend to the members of a special litigation committee the presumption of good faith and disinterestedness. As the *Auerbach* court recognized, the policies of the business judgment rule do not protect from judicial scrutiny the complexion and procedures of a special litigation committee. . . . The courts . . . are particularly well-equipped to evaluate the fairness of a committee's make-up and procedures. In *Auerbach*, the court concluded:
>
>> As to the methodologies and procedures best suited to the conduct of an investigation of facts and the determination of legal liability, the courts are well equipped by long and continuing experience and practice to make determinations. In fact they are better qualified in this regard than are corporate directors in general.
>
> 419 N.Y.S. 2d at 929, 393 N.E. 2d at 1003. Thus although the policies of the business judgment rule may accord to the substantive business conclusions of a special litigation committee a presumption of soundness, those policies do not accord to the committee's members a presumption of good faith.

The delegation of corporate power to a special committee, the members of which are hand-picked by defendant-directors, in fact, carries with it inherent structural biases. In their seminal article on the status of shareholder derivative actions, Coffee and Schwartz found in the members of a special litigation committee a strong potential for bias:

> A derivative action invokes a response of group loyalty, so that even a 'maverick' director may feel compelled to close ranks and protect his fellows from the attack of the 'strike suiter.' As a result, an outside director independent enough to oppose a chief executive officer with re-

Alford v. Shaw

> spect to a proposed transaction he thinks is unfair or
> unwise may still be unable to tell the same officer that
> he thinks the suit against him has sufficient merit to pro-
> ceed . . . a refusal to protect one's peers once events
> have transpired is seen as disloyal treachery.

Coffee & Schwartz, *The Survival of The Derivative Suit: An
Evaluation and a Proposal for Legislative Reform*, 81 Colum-
bia L.Rev. 261, 283 (1981).

The problems of peer pressure and group loyalty exist *a
fortiori* where the members of a special litigation committee
are not antagonistic, minority directors, but are carefully
selected by the majority directors for their advice. Far from
supporting a presumption of good faith, the pressures placed
upon such a committee may be so great as to justify a pre-
sumption against independence. *See* Dent, *The Power of Di-
rectors to Terminate Shareholder Litigations: The Death of
The Derivative Suit*, 75 Northwestern L.Rev. 96 (1981).

*Hasan v. CleveTrust Realty Investors*, 729 F. 2d 372, 376-77.

The threshold guarantee of the integrity of an independent
litigation committee is the requirement of its independence and
freedom from influence of the defendants named in the derivative
suit. Permitting defendants to choose committee members would
ignore the fact that colleagues of the defendants cannot be impar-
tial in evaluating the merits of claims against those who appoint-
ed them to the committee. *E.g., Joy v. North*, 692 F. 2d 880, 888;
*Bias in the Boardroom* at 91-108, 132 (analyzing factors which lead
individuals selected by board of directors to conform their deci-
sion-making behavior to the board's normative view, which view
usually disfavors derivative suits). Even permitting nondefendant
directors to choose members of or to participate in an allegedly
independent executive committee established to evaluate a deriv-
ative suit does not purge the committee of bias. Nondefendant
board members continue to be part of the cohesive, loyal, con-
forming ingroup which favors outcomes that will not damage
their colleagues' esteem or judgment:

> The directors called upon to evaluate a derivative suit
> against their colleagues are not, and generally have not been,
> isolated from the suit's defendants. As members of the board

of directors they continue to interact with the defendants, who usually remain directors or officers of the corporation. Even members of a special litigation committee who were appointed *after* the derivative suit was initiated are legally bound under the organic requirements for committee membership to serve as directors on the full board. The new special litigation committee members and the defendant directors therefore serve as colleagues on the same corporate board in addressing an array of nonderivative suit issues. Consequently, the judges and those to be judged associate on a regular basis in discharging their many tasks as corporate directors during the preliminary derivative suit skirmishes. In doing so, they share a mutual duty to serve the corporate interest, and they often adopt a common view of that corporate interest. Analogous studies suggest that the effect of these shared experiences is not only to bond the directors and the defendants together but also to form a basis upon which the [independent] directors can be expected to give greater weight to the defendant's values, attitudes, and perceptions than to those of outgroup members like the plaintiff. . . .

More is involved in the dynamics of intergroup discrimination in the demand or special litigation committee context than the seemingly simple categorization of the nondefendant directors as "directors," a category which also includes the defendants. As seen earlier, individuals place great value on their selection to and membership on a corporation's board: They are attracted to their colleagues and value greatly the associations they reap from the directorship. The relative attractiveness and rewards of board membership to the nondefendant director are important considerations in the director's ability to be an impartial arbitrator of a colleague's behavior.

*Bias in the Boardroom* at 103-04 (footnotes omitted). *See also, e.g.,* Brudney, *The Independent Director: Heavenly City or Potemkin Village?*, 95 Harv. L. Rev. 597 (1982).

Because of the potential for such structural bias, it is my opinion that a rule which permits a trial court to determine that a litigation committee chosen even by nondefendant directors is in-

dependent provides less than an empty prayer for the impartiality needed to ensure the integrity of a litigation committee. *Cf. Miller v. Register and Tribune Syndicate, Inc.*, 336 N.W. 2d 709; *Zapata Corp. v. Maldonado*, 430 A. 2d 779, 787 (when independent directors are called upon to participate in executive committee established to evaluate litigation, "[t]he question naturally arises whether a 'there but for the grace of God go I' empathy might not play a role"); *Bias in the Boardroom* at 117. A judicial inquiry into the alleged independence, good faith, and reasonable investigation of a committee established under such circumstances is fatuous at best. *Cf.* ALI Principles of Corporate Governance and Structure: Restatement and Recommendations § 7.03(e) (Tent. Draft No. 1, 1982).

If the use of a special committee is to be the means for corporate evaluation of whether to go forward with a derivative suit when plaintiffs have alleged malfeasance of corporate directors, the only balanced way to proceed is for parties to the suit to petition the trial court to appoint a committee whose members have no connection with either the parties to the suit or the suit itself.[3] This committee, rid of the structural bias inherent in the *Auerbach* approach, would review the allegations of the derivative suit with input from all litigants concerning, e.g., the legal merits of the suit and its practical impact on the corporation's business and internal management, before submitting the committee report to the court for judicial review. Because such a report will have been prepared by a committee not sharing defendants' biases, the court would then be able to focus on the legal and factual merits of the complaint, as well as the costs and/or benefits to the corporation resulting from a decision to prosecute or not to prose-

---

3. As one court stated when discussing plaintiff's allegations that corporate directors diverted a corporate opportunity to themselves:

"If [plaintiff's allegation] is true, it is difficult to imagine a more egregious breach of fiduciary duty. In the present corporate litigation climate, a stockholder's welfare rests almost solely on the judgment and independence of his directors. Any reasonably valid claim that the directors acted because of a conflict of interest involving their own selfish economic interest should bear close scrutiny by an impartial tribunal—not a one-man committee appointed by the alleged wrong doers."

*Lewis v. Fuqua*, 502 A. 2d 962, 972 (Del. ch. 1985), *appeal refused*, 504 A. 2d 571 (Del. 1986).

cute the suit, instead of focusing on potentially inherent biases of the committee which would otherwise frame the court's analysis. *See Bias in the Boardroom* at 132-35. Such prophylactic rules are required to prevent the potential for structural bias inherent in the use of a litigation committee whose members are chosen by corporate officials who may share the majority of this Court's evident, but unwarranted, presumption that many if not most derivative suits are merely strike suits. *Bias in the Boardroom* at 89 ("directors perceive the typical derivative suit [as being an] unscrupulous strike suit. Such a view of the derivative suit can only introduce a very solid source of decision bias to the choice between the suit's continuance and its dismissal."). *See Miller v. Register and Tribune Syndicate, Inc.*, 336 N.W. 2d 709.

The majority's assessment of the adequacy of the trial court's evaluation of the evidence before it also exposes jurisprudential weakness in the standard of analysis applied.[4] After noting that the special investigative committee interviewed sixteen people, reviewed numerous documents, and submitted interrogatories to some relevant persons before preparing its report, the majority then dismissively rejects plaintiffs' objection to defendants' motions for partial summary judgment because instead of identifying "false" items of information relied upon by the special committee, one of plaintiffs' affiants identified only "erroneous or questionable" information which defendants provided to the committee. The majority goes on to state:

> Because Mr. Anderson's affidavit contains a challenge to the Committee's judgment, not to its independence or good faith, and does not suggest any available information which the Committee did not consider, it raises no question regarding issues which we have said are appropriate for determination of the ruling on the motion for summary judgment.

---

4. The majority first determines that the trial court properly found that the members of the special investigative committee were sufficiently uninvolved with the affairs of defendants so as to be genuinely disinterested in and independent of defendants and their corporate affairs. Although concerns regarding structural bias would normally require careful scrutiny of the independence and disinterestedness of the committee, plaintiffs in this case do not contest the disinterested independence of the committee members and therefore neither the trial court nor, a fortiori, the appellate division, is required to address this issue.

Alford v. Shaw

In addition to drawing an opaque epistemological distinction between "false" information and "erroneous" information, the majority's approach omits consideration of those parts of plaintiffs' objection which clearly expose the need for neutral judicial review of the adequacy, scope, and conclusions of the special committee's investigation.[5] Besides alleging that defendants supplied the committee with critical false pieces of information, plaintiffs objected, inter alia, that:

> 2. The business judgment defense sought to be raised by AAA through the Special Committee does not apply because the claims alleged in the Complaint involve multiple conflicts of interest between the defendants, particularly the Shaw Group, and AAA, and the conflicts of interest alleged in the Complaint and confirmed by the Committee Report have not been resolved.
>
> . . . .
>
> 4. The business judgment defense sought to be raised by AAA through the Special Committee does not apply because the claims alleged in the Complaint result from the obvious and prolonged failure of the defendants to exercise oversight and supervision of AAA to the egregious detriment of AAA, and this failure to exercise the oversight and supervision required by the laws of North Carolina has not been corrected.
>
> 5. The business judgment defense sought to be raised by AAA through the Special Committee does not apply because the claims alleged involved no business purpose for AAA, and the defendants who caused AAA to engage in the wrongful and unlawful acts alleged in the Complaint and confirmed by the Committee Report are still in control of the business affairs of AAA.
>
> . . . .
>
> 7. The Committee Report is not sufficiently thorough to warrant the Court's dismissal of plaintiff's [sic] claims and approval of the proposed $250,000 settlement.

5. Similarly the majority excerpts only a few general phrases from the detailed and lengthy affidavit of plaintiffs' affiant.

8. The Committee Report is not thorough because it is based upon incomplete, insufficient and misleading information, a large part of which was gathered by counsel, not the Special Committee.

9. The Committee Report is not thorough because the information is unsworn and there was no opportunity for cross-examination by the Special Committee or counsel for the plaintiffs.

10. The Committee Report could not be sustained upon a trial of plaintiffs' claims.

11. The Shaw Group supervised or participated in the organization and structure of the Special Committee.

12. Approval of the Committee Report and the proposed $250,000 settlement would be inequitable, unfair, unreasonable, prejudicial and contrary to the best interests of AAA, AAA's shareholders (now or formerly), AAA's policyholders and the public of North Carolina.

By rejecting a test that would require the trial court to examine and resolve these issues, the majority's *Auerbach*-type approach permits defendants to seal from judicial review serious issues affecting plaintiffs' rights as minority shareholders under North Carolina law. *Cf. Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E. 2d 551 (1983). At the very least plaintiffs should be permitted to develop and present evidence in the neutral forum of superior court: (1) that the committee, though perhaps disinterested and independent, may not have been *qualified* to assess intricate and allegedly false tax and accounting information supplied to it by those in the corporate culture who would benefit from decisions not to proceed with litigation,[6] (2) that, in fact, false and/or incomplete information was supplied to the committee because of the nonadversarial way in which it gathered and evaluated information, and therefore (3) in light of these and other problems which arise from the structural bias inherent in the procedures approved by today's majority opinion, that the

---

6. Such is suggested by plaintiffs' affiant in this case. Under the majority's "disinterested and independent" standard, a professor of philosophy who knew nothing about accounting or corporate law would be acceptable as a committee member.

committee's decisions with respect to litigation eviscerate plaintiffs' opportunities as minority shareholders to vindicate their rights under North Carolina law. *Cf.* Dent, *The Power of Directors to Terminate Shareholder Litigations: The Death of The Derivative Suit,* 75 Nw. U.L. Rev. 96 (1981). Such is especially true in cases, like this one, where serious and complex allegations of breaches of fiduciary duty by defendant-directors caused minority shareholders to have to file a derivative suit on behalf of the corporation. The courts of this state should not participate in shielding from justice the possible wrongdoing of those against whom grievances have been lodged.

It is clear from the materials submitted by plaintiffs in support of their objections to defendants' motions for summary judgment that material issues of fact exist surrounding the adequacy of the investigation conducted by and the conclusions reached by defendants' litigation committee. Those accused of breach of fiduciary duties owed to a corporation and its shareholders should not be permitted to close the courthouse doors to plaintiffs merely by appointing a special committee which allows them to avoid the burden of proving challenged transactions to be fair and reasonable to those to whom the fiduciary duties are owed. The public policy of this state favoring derivative actions compels the conclusion that the approach espoused by the majority of this Court and the entry by the trial court of summary judgment in favor of defendants are inappropriate. N.C.G.S. § 55-55(c).

Moreover, I note that the majority's capitulation to the decisions of an executive committee hand chosen by the corporation whose very refusal to sue caused the plaintiff-shareholder to bring suit constitutes an unconstitutional delegation of judicial power under our state constitution. *Cf. State v. Matthews,* 270 N.C. 35, 153 S.E. 2d 791 (1967). Although article IV, section 1 of the North Carolina Constitution is an express limitation of legislative power, it is clear that this Court cannot by its opinions establish a court. By adopting *Auerbach* and establishing a presumption of good faith, the majority has in effect created a court whose decisions affecting the substantive rights of the parties are unreviewable. Such procedure also violates article I, section 18 of the North Carolina Constitution. This section guarantees access to the courts for redress of injuries. *Osborn v. Leach,* 135 N.C. 628, 47 S.E. 811 (1904). The majority's *Auerbach* procedure im-

pairs the right of persons to have their complaints resolved by the courts of this state. *See Lamb v. Wedgewood South Corp.*, 308 N.C. 419, 302 S.E. 2d 868 (1983). Simply put, redress by an *Auerbach*-type committee is not redress within the meaning of article I, section 18 of our constitution. Presumably, the legislature had this in mind when it adopted N.C.G.S. § 55-55 (c).

By this dissent I paint no stains upon the character and integrity of the Honorable Francis Marion Parker, my valued friend of long standing, nor upon Mr. Follin. It is not the actions of Judge Parker and Mr. Follin that trouble me, but the adoption of the rule itself, which will be applied in all future cases.