**Dr. Malik M. HASAN and Seeme Hasan, Plaintiffs-Appellants,**

v.

**CLEVETRUST REALTY INVESTORS, et al., Defendants-Appellees.**

No. 82–3691.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 28, 1983.

Decided March 2, 1984.

Jerome Congress/Melvyn I. Weiss (argued), Milberg, Weiss, Bershad & Spectrie, New York City, Edward W. Cochran (Lead Counsel), Kohrman, Jackson & Weiss, Co., LPA, Cleveland, Ohio, for plaintiffs-appellants.

Daniel W. Hammer (argued), Thompson, Hine & Flory, Cleveland, Ohio, for Cleve-Trust Realty Investors.

Richard Cusick, Brian M. Eisenberg, Michael E. Brittian, Calfee, Halter & Griswold, Cleveland, Ohio, for Merchant Navy Officers.

Before MERRITT and JONES, Circuit Judges; and HOLSCHUH, District Judge.[*]

NATHANIEL R. JONES, Circuit Judge.

This shareholder derivative action is presently before the Court upon the appeal of stockholders, Dr. Malik M. Hasan and Seeme Hasan (Hasan), from an order of the district court, 548 F.Supp. 1146, granting appellees' motion for summary judgment. Appellants contend that summary judgment in favor of CleveTrust, eight trustees, an advising firm and the Merchant's Fund (CleveTrust) was improperly based upon the recommendation of a Special Litigation Committee, the independence, good faith and thoroughness of which presented genuine issues of material fact. Hasan also argues that the district court erred as a matter of law in its particular application of the business judgment rule to the facts of this case. Upon consideration of the complex issues presented by this appeal, we conclude that the district court erred in granting summary judgment because of the existence of genuine issues of material fact which preclude summary judgment as a matter of law.

CleveTrust is a Massachusetts Real Estate Investment Trust with its principal place of business in Ohio. On a national level, CleveTrust's stock prices declined to an amount less than the appraised value of their investment properties. The corporation thus became attractive to companies with an eye toward take over ventures. Two such companies, Tulip and Champion, each acquired 22.4% of CleveTrust's outstanding stock and expressed an interest in purchasing a controlling block of shares. In the event of a takeover, appellee Trustees and Advisers would forfeit their positions. They arranged therefore to repurchase with corporate funds at a price exceeding the fair market value the stock which Tulip and Champion had previously acquired. The Trustees and Advisers also arranged to sell 30% of the CleveTrust's outstanding shares at two-thirds their appraised value to appellee Merchant Navy Officers Pension Fund Trustee, Ltd., (Merchant Fund). In return for the stock, the Merchant Fund agreed to support Cleve-Trust's current management, to refrain from selling any stock for a five year period and to give the Trustees and Advisers the first option to repurchase the entire block of CleveTrust stock. The revenue acquired from this sale was used to pre-pay CleveTrust's prior debts, two years before they matured.

As a holder of a significant amount of CleveTrust stock, Hasan brought a derivative action in district court alleging that, through these stock transactions, the Trustees, Advisers and Merchant Fund caused direct and intentional harm to CleveTrust by wasting corporate assets in order to protect their own lucrative positions. The trustees thereafter appointed a special committee of non-defendant, board members to investigate the challenged transactions and to determine whether the derivative suit would be in the corporation's best interests. Hasan, however, named all but one member of the board of trustees in his suit. The special committee therefore consisted only of Peter Galvin, who was ap-

---

[*] The Honorable John D. Holschuh, United States District Court for the Southern District of Ohio, sitting by designation.

pointed to the board just after the disputed transactions had been completed.

Galvin retained counsel and, based upon interviews with named defendants and others, prepared a 122 page report. The report revealed that Galvin, a real estate broker, owned 25% of a firm that received substantial leasing fees from a company managed by James Carney, the Chairman of the CleveTrust Board. The report also stated that Galvin held a 2% interest in an investment partnership with another named defendant. Galvin concluded however that his own business associations with these named defendants did not compromise the disinterestedness of his investigation and recommendation. Galvin's report rejected each of Hasan's allegations, found that the stock transactions benefitted CleveTrust and concluded that the derivative action was not in the corporation's best interests.

Based upon Galvin's report, the named defendants moved for summary judgment and opposed discovery on the merits. Although the district court allowed discovery on the good faith, independence and thoroughness of Galvin's Committee, Hasan did not participate in such a discovery. Instead, Hasan submitted a sworn affidavit, challenging the substantive charges, and contended that Galvin's report and the circumstances surrounding its creation themselves demonstrated the committee's bias.

The district court, however, granted the defendants' motion for summary judgment and dismissed the complaint with prejudice. The court considered summary judgment proper because the facts relevant to the case were "not in dispute." The court also concluded that the applicable Massachusetts version of the business judgment rule would grant a special committee "a presumption of good faith, subject to concrete evidence to the contrary." Because Hasan failed through discovery to introduce any affirmative evidence of the committee's bias, the district court reasoned, the presumption of good faith was not rebutted and the committee's report was controlling. The district court determined that the de-fendants had the power to dismiss this derivative suit against themselves and therefore concluded that summary judgment was appropriate as a matter of law.

■ In reviewing the district court's summary judgment order, we must first determine whether Federal Rule of Civil Procedure 56(c) applies in the special context of a derivative action. The shareholder derivative action emanates historically from equity jurisdiction. *Hawes v. Oakland*, 104 U.S. 450, 26 L.Ed. 827 (1881). Rule 56(c) applies equally to actions at law and actions in equity. The Advisory Notes to that rule state explicitly that the summary judgment standard "is applicable to all actions." As is true generally under Rule 56(c), therefore, summary judgment must be denied in a proceeding for equitable relief either where genuine issues of material fact exist, *S.E.C. v. Koracorp Industries, Inc.*, 575 F.2d 692 (9th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978); *Hess v. Schlesinger*, 486 F.2d 1311, (D.C.Cir.1973), or where judgment is inappropriate as a matter of law. *Booth v. Barber Transportation Corp.*, 256 F.2d 927 (8th Cir.1958). We are thus guided in our review of the district court's summary judgment order in this equitable, derivative action by the normal Rule 56(c) standard. *See Gaines v. Haughton*, 645 F.2d 761, 769 (9th Cir.), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982). We must therefore view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact existed as to the disinterestedness of the special litigation committee. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Malis v. Hills*, 588 F.2d 545 (6th Cir.1978).

The district court found no such genuine issue of material fact. That finding was based upon the legal conclusion that a presumption of good faith attaches to the report and recommendation of a special litigation committee. If that presumption is not rebutted by affirmative evidence, the district court reasoned, then the special

litigation committee's recommendation to dismiss the derivative suit must be followed. The initial question before us on appeal therefore is whether the district court erred "as a matter of law" in granting to Galvin's special litigation committee a presumption of good faith.

■ The basic authority of directors to terminate shareholder derivative litigation is governed by applicable state law unless that law is inconsistent with the federal policies on which the litigation is based. *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). Because CleveTrust is a Massachusetts corporation, the law of that state governs this action. The Massachusetts courts have not addressed the precise issue before this Court. We must predict whether those courts would approve the dismissal of a derivative action upon the recommendation of a special litigation committee, which committee enjoys a presumption of good faith. In so predicting, we must consider the decisions of those states which have analyzed this issue in order to determine which line of analysis Massachusetts, in light of its general approach to derivative suits, is likely to follow.

The corporate law in most states is fairly uniform in sanctioning the general power of a special litigation committee to terminate a stockholder suit. *See Burks*, 441 U.S. at 480, 99 S.Ct. at 1838; *Lewis v. Anderson*, 615 F.2d 778, 782–83 (9th Cir.) *cert. denied*, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980) (applying California law); *Abbey v. Control Data Corp.*, 603 F.2d 724, 729 (8th Cir.), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980) (applying Delaware law); *Grossman v. Johnson*, 89 F.R.D. 656, 662–63 (D.Mass. 1981) (applying Maryland law); *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979).

The law in these jurisdictions is split, however, on the question of the scope of appropriate judicial inquiry into the findings of a special litigation committee. In *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.S.Ct.1981), the court analyzed under Delaware law the role of the judiciary in reviewing the actions of a special litigation committee authorized to terminate a derivative action. That court was not content to rely upon the business judgment rule to ensure that a special corporate committee acted independently and in good faith in reaching its decisions to forego litigation. Rather, the Delaware Supreme Court established a two-pronged test:

> First, the court should inquire into the independence and good faith of the committee and the bases supporting its conclusion.... The Corporation should have the burden of proving independence, good faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness.

430 A.2d at 788. Once the reviewing court is satisfied that the committee has met its burden of proving good faith and reasonableness, the court proceeds to the second prong. That prong requires the court to "determine, applying its own business judgment, whether the motion should be granted." 430 A.2d at 788–89. *See also Abramowitz v. Posner*, 672 F.2d 1025 (2nd Cir.1982); *Joy v. North*, 692 F.2d 880 (2nd Cir.1982) (applying Connecticut law). If we applied to the case before us the *Zapata* approach, therefore, we would assign to CleveTrust the initial burden of establishing its good faith and independence in seeking termination *and then* subject its judgment to objective scrutiny.

But the Delaware approach is hardly the only guideline by which we may predict how the Massachusetts Courts would apply to this case the business judgment rule. Many states have adopted an approach more deferential to the recommendation of a special litigation committee than that of Delaware. Perhaps most typically, in *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979), the New York Court of Appeals held that the business judgment rule shielded from judicial scrutiny the decision of a special litigation committee to terminate a shareholder derivative action. That decision varies significantly from the Delaware approach in

its rejection of judicial authority to apply its own business judgment to the committee's *substantive* recommendations. "To permit judicial probing of such issues," the *Auerbach* court reasoned, "would be to emasculate the business judgment doctrine ..." 419 N.Y.S.2d at 928, 393 N.E.2d at 1002. The court concluded that the committee's "substantive evaluation of the problems posed and its judgment in their resolution are beyond our reach." *Id.* Were we to apply the *Auerbach* standard to the case before us, therefore, we would be precluded from evaluating Galvin's *substantive* recommendations.

Even the *Auerbach* approach, however, empowers this Court to consider the procedural mechanisms of the committee. The *Auerbach* Court, in fashioning its deferential view, was careful to state that

> The business judgment rule does not foreclose inquiry by the courts into the disinterested independence of those members of the board chosen by it to make the corporate decision on its behalf.... Indeed the rule shields the deliberations and conclusions of the chosen representatives of the board *only if they possess a disinterested independence and do not stand in a dual relation which prevents an unprejudicial exercise of judgment.*

(emphasis added), 419 N.Y.S.2d at 927, 393 N.E.2d at 1001. The court then proceeded to examine carefully the complexion and the procedures of the special litigation committee. Finding that "[n]one of the three [committee members] had had any prior affiliation with the corporation" and that "the procedures and methodologies chosen and pursued by the special litigation committee" were superior, the *Auerbach* Court concluded that nothing on the record raised a "triable issue of fact." 419 N.Y.S.2d at 927–930, 393 N.E.2d at 1001–003. Under both *Auerbach* (New York law) and *Zapata* (Delaware law), then, a reviewing court must scrutinize the record to determine whether a genuine issue of material fact exists as to the committee's independence, good faith and procedural fairness. The question therefore is not whether this Court has authority to review the good

faith of a special litigation committee; it does. The question before us, rather, is by what standard this Court must review the committee's possible biases.

█ The district court concluded that a reviewing court must accord the committee a presumption of good faith. We disagree. Neither the *Auerbach* approach nor the *Zapata* approach allows a reviewing court to extend to the members of a special litigation committee the presumption of good faith and disinterestedness. As the *Auerbach* court recognized, the policies of the business judgment rule do not protect from judicial scrutiny the complexion and procedures of a special litigation committee. The "business judgment doctrine," that court reasoned:

> Is grounded in the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments.

419 N.Y.S.2d at 926, 393 N.E.2d at 1000. The courts however are particularly well-equipped to evaluate the fairness of a committee's makeup and procedures. In *Auerbach*, the court concluded:

> As to the methodologies and procedures best suited to the conduct of an investigation of facts and the determination of legal liability, the courts are well equipped by long and continuing experience and practice to make determinations. In fact they are better qualified in this regard than are corporate directors in general.

419 N.Y.S.2d at 929, 393 N.E.2d at 1003. Thus although the policies of the business judgment rule may accord to the substantive business conclusions of a special litigation committee a presumption of soundness, those policies do not accord to the committee's members a presumption of good faith.

The delegation of corporate power to a special committee, the members of which are hand-picked by defendant-directors, in fact, carries with it inherent structural biases. In their seminal article on the status

of shareholder derivative actions, Coffee and Schwartz found in the members of a special litigation committee a strong potential for bias:

> A derivative action invokes a response of group loyalty, so that even a 'maverick' director may feel compelled to close ranks and protect his fellows from the attack of the 'strike suiter.' As a result, an outside director independent enough to oppose a chief executive officer with respect to a proposed transaction he thinks is unfair or unwise may still be unable to tell the same officer that he thinks the suit against him has sufficient merit to proceed ... a refusal to protect one's peers once events have transpired is seen as disloyal treachery.

Coffee & Schwartz, *The Survival of The Derivative Suit: An Evaluation and a Proposal for Legislative Reform*, 81 Columbia L.Rev. 261, 283 (1981).

The problems of peer pressure and group loyalty exist *a fortiori* where the members of a special litigation committee are not antagonistic, minority directors, but are carefully selected by the majority directors for their advice. Far from supporting a presumption of good faith, the pressures placed upon such a committee may be so great as to justify a presumption against independence. *See* Dent, *The Power of Directors to Terminate Shareholder Litigations: The Death of The Derivative Suit*, 75 Northwestern L.Rev. 96 (1981). In the case before us, however, we need not determine the propriety of a conclusive presumption against good faith. We do conclude, though, that the policies of the business judgment rule do not create a presumption in favor of the good faith of a special committee and that the realities of corporate life militate against any such presumption.

We must now predict whether the Massachusetts Courts would support the policies which dictate, and recognize the realities which militate, against a presumption of good faith. The district court found that Massachusetts would prefer to resolve the shareholders' allegations in the "board-room rather than in the courtroom." Our review of Massachusetts corporate law, however, leads us to predict that the Massachusetts courts would find that the district court erred in presuming Galvin's good faith. In cases in which the directors of a corporation are charged with self-dealing, the Massachusetts courts have not applied the business judgment rule. *American Discount Corp. v. Kaitz*, 348 Mass. 706, 206 N.E.2d 156 (1965). Those courts will "vigorously scrutinize the situation" where a director's duty of loyalty to the corporation is in conflict with his or her self-interest. *See, e.g., Production Machine Co. v. Howe*, 327 Mass. 372, 99 N.E.2d 32 (1951). The Massachusetts Courts have oft-expressed their unwillingness to allow the business judgment rule to shield the fiduciary transgressions of corporate directors.

The Massachusetts courts furthermore have expressed their skepticism about the ability of the members of a special committee to engage in an independent inquiry about the possible misconduct of their peers. In *Pupecki v. James Madison Corp.*, 376 Mass.2d 212, 382 N.E.2d 1030 (1978), the Supreme Judicial Court of Massachusetts held that summary judgment was inappropriate in an action brought by a minority shareholder against the corporation alleging the unlawful sale of assets for inadequate consideration. The court, in concluding that any demand would have been "futile," reasoned that those directors entrusted to decide whether to pursue litigation would be influenced heavily by their corporate counterparts:

> We think that it can be inferred from Fisher's control of the outstanding voting stock that the directors would have acted in a manner favorable to his interests.

382 N.E.2d at 1034. Such an inference hardly coincides with the district court's presumption of Galvin's good faith.

The Massachusetts courts moreover have had occasion to doubt the disinterestedness of a corporate decision made under the auspices of a majority of directors. In *In*

*Re Kauffman Mutual Fund Actions,* 479 F.2d 257 (1st Cir.1973), the First Circuit declared that "[t]he presumption supplied by 15 U.S.C. § 80a–2(a)(9) that '[a] natural person shall be presumed not to be a controlled person'" did not apply to "non-affiliated" directors who decided that litigation was not in the corporation's best interests. 479 F.2d at 265. Any presumption of such "non-affiliated" directors' disinterestedness, the court suggested, would be error. *Id.* The court further opined that

> If a director goes along with a colleague in an act on its face advantageous only to that colleague and not to the corporation, this in itself is a circumstance, or particularity, supporting the claim that he is under that colleague's control.

479 F.2d at 265. In *Kauffman,* then, the court infers from the very fact of a nonaffiliated director's decision to forego litigation in support of a "colleague" the likelihood of bias.

■ In *Untermeyer v. Fidelity Daily Income Trust,* 580 F.2d 22 (1st Cir.1978), the First Circuit relied upon *Kauffman* for the proposition that a "defendant charged with self-benefiting misconduct, and who [sic] is affirmatively shown to be able to prevent the trust or corporation from suing him," should not be able to require the shareholder to prove that his influence was not a factor. 580 F.2d at 24. The First Circuit and the Massachusetts Courts, therefore, have articulated a firm willingness to allow judicial scrutiny of corporate abuses and to place upon corporate decision-makers the burden of proving their disinterestedness. Having analyzed the so-called polar approaches embodied in *Zapata* and *Auerbach,* the policies of the business judgment rule, the realities of corporate collegiality and the predilections of the Massachusetts Courts, we conclude that the district court erred in applying to Galvin a presumption of good faith.

Absent any such presumption, we must determine whether the corporate defendants in this case have demonstrated the good faith and procedural adequacy of Galvin's investigation. We depart neither from the *Auerbach* nor the *Zapata* approach when we scrutinize the "proof submitted by the defendants" for evidence of disinterestedness. *See Auerbach,* 419 N.Y. S.2d at 927, 393 N.E.2d at 1001; *Zapata,* 430 A.2d at 788. While those cases diverge on the issue of the judicial deference appropriate to the substantive business judgments of a special committee, they are convergent in their approach to the issues of good faith and thoroughness. In *Zapata,* of course, the court required the corporation to demonstrate the good faith and thoroughness of the special litigation committee. Even in *Auerbach,* however, the court examined carefully the proof submitted by the *defendants* to determine whether the members of a special litigation committee possessed "a disinterested independence" or stood "in a dual relation which prevents an unprejudicial exercise of judgment." 419 N.Y.S.2d at 927, 393 N.E.2d at 1001. The court further stated that the corporate defendants themselves would

> be expected to show that the areas and subjects to be examined are reasonably complete and that there has been a good faith pursuit inquiry into such areas and subjects.

419 N.Y.S.2d at 929, 393 N.E.2d at 1003.

In the case before us, the corporate defendants have failed to demonstrate that the areas and subjects examined are reasonably complete and that there has been a good faith inquiry into those areas and subjects. Although the plaintiffs declined to pursue discovery on these issues, Galvin's report itself raises serious questions about the integrity of his committee's findings. That report traces the history of his business relationship with defendant James M. Carney, the Chairman of the CleveTrust Board. In 1968, Galvin possessed a 1/7 interest in "Cragin, Lang," a leasing and management firm. Galvin's firm entered into a services agreement with Investment Plaza Company, of which Carney was a partner. By 1977, Galvin had become President of "Cragin, Lang" and Carney had become managing partner of Investment

Plaza. The close business relationship between Carney and Galvin continued after Galvin left "Cragin, Lang." When, in 1979, Galvin became a founding principal and 25% owner of "Adler Galvin Rogers, Inc.," he brought with him Carney's account. At the same time, leasing contracts for properties included within Carney's investment company were transferred from "Cragin, Lang" to "Adler Galvin Rogers."

Galvin, as a founding principal and 25% owner of a leasing and management company, also has a keen interest in attracting real estate developers. Defendant Carney is an active real estate developer in the Cleveland area. Furthermore, Galvin and defendant-trustee Alfred M. Rankin are partners in Bar Associates, a firm which owns a large apartment building in downtown Cleveland. Galvin owns a 2% interest in the building and Rankin owns a 10% interest.

■ The special litigation committee's report, therefore, by itself, demonstrates several significant business relationships between Galvin and the defendants to this derivative suit. The case before us therefore is clearly distinguishable from *Auerbach*. In *Auerbach*, the court "examined" the defendants' proof and found that none of the three "disinterested directors" who comprised the special litigation committee had "any prior affiliation with the corporation." 419 N.Y.S.2d at 922, 927, 393 N.E.2d at 997, 1001. The Court further concluded that the defendants "followed prudent practice" in excluding from the decision-making process those individuals who had "personal interests which may conflict with the interests of the corporation." 419 N.Y.S.2d at 928, 393 N.E.2d at 1001. CleveTrust, by contrast, did not follow "prudent practice" when it selected Peter Galvin as the only member of its special litigation committee. Galvin's "personal interests" and "prior affiliation with the corporation" preclude any affirmative demonstration of disinterest. We find therefore that the corporation has not met its burden of demonstrating the good faith

and disinterestedness of Galvin's "committee."

■ We also find that the corporation failed to demonstrate the procedural adequacy of Galvin's investigation. Galvin failed to interview representatives from Tulip and Champion, the firms which acquired 22.4% of CleveTrust stock in one of the challenged transactions. Tulip and Champion could have provided crucial evidence of the purpose of that challenged transaction and the value of CleveTrust's transferred assets. The committee's report indicates that the transaction with Tulip and Champion "avoids the anticipated proxy fight." (Exhibit 20). Thus the report itself alludes to the trustee's potential loss of control of the corporation. Testimony from Tulip and Champion would provide further concrete evidence of CleveTrust's possible self-interested motivation for the transaction.

Galvin's investigation stands in direct contrast to the special litigation committee's investigation in *Auerbach*. The *Auerbach* Court found that the committee promptly engaged eminent special counsel for guidance, examined the prior work of a special audit committee, interviewed representatives of Wilmer, Cutler & Pickering, and reviewed testimony before the SEC. Perhaps most important, the Court found that the committee conducted personal interviews with individuals who had "participated in any way in the questioned payments." 419 N.Y.S.2d at 930, 393 N.E.2d at 1003. Unlike the committee's efforts in *Auerbach*, therefore, Galvin's investigation lacked the thoroughness which is necessary for a truly objective and meaningful recommendation.

■ Under the particular facts of this case, we are convinced that the Massachusetts courts would question seriously the good faith and thoroughness of Galvin's recommendation to forego litigation. Galvin's report itself reveals factual issues of disinterestedness and thoroughness which preclude summary judgment. After careful consideration of the law and policies in this field, we also predict with some degree

**380**

of certainty that the Massachusetts courts would require CleveTrust to demonstrate Galvin's good faith and thoroughness. Saddled with that burden, the corporation can not show Galvin's good faith and thoroughness. The corporation's inability to meet its burden precludes summary judgment as a matter of law. Even if the Massachusetts courts followed the deferential *Auerbach* approach, they would be compelled in this case to conclude that the corporation has not met its burden of demonstrating the disinterestedness and procedural adequacy of Galvin's investigation. Because Galvin's recommendation is based upon his procedurally infirm investigation, that recommendation can not justify the corporation's decision to forego this derivative suit. We hold therefore that the Massachusetts courts, mindful of *Auerbach, Zapata,* the proper scope of the business judgment rule and the potential for corporate abuse of that rule, would vacate the district court's summary judgment order and remand for a trial on the merits of Hasan's substantive allegations.

Accordingly, we hereby VACATE the judgment of the district court and REMAND for a trial on the merits.