**Arnold L. GRAYER, Plaintiff,**

v.

**COPPERWELD STEEL COMPANY, Defendant.**

Civ. A. No. C86–4099Y.

United States District Court, N.D. Ohio, E.D.

Jan. 29, 1988.

Edward G. Kramer, Marilyn Tobocman Sobol, Kramer and Tobocman, Cleveland, Ohio, for plaintiff.

Linda Hauserman Harrold, Hahn, Loeser & Parks, Cleveland, Ohio, Keith C. Hult, Dana S. Connell, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Arnold Grayer brings this action against his former employer, the Copperweld Steel Company ("Copperweld"). Grayer alleges illegal discrimination on the basis of race and illegal retaliation for filing discrimination charges with the Equal Employment Opportunity Commission ("EEOC") and for testifying on behalf of another black employee, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Copperweld has moved for summary judgment, alleging that its firing was the result of a neutral application of a neutral absenteeism program. For the reasons set forth below, Copperweld's motion is granted and Grayer's claims are dismissed.

### I

The parties agree as to the relevant and material facts; however, they strongly dispute the proper conclusions to be drawn from those facts.

A. Grayer alleges that he was discriminated against beginning when George Brown became his supervisor. When he received two disciplinary suspensions in 1979, Grayer secretly examined the work records of fellow employees and discovered that white employees who had more unex- cused absences than he did had not been disciplined. Grayer testified as to this in *Spiva v. Copperweld Steel Company*, Civil Action No. C79–278 (N.D.Ohio Feb. 12, 1980) [available on WESTLAW, 1980 WL 114]. Partly as a result of Grayer's testimony, the court found Copperweld guilty of intentionally discriminating against Spiva because of race in its discipline of Spiva's absenteeism.

Grayer alleges, and offers an independent witness to corroborate, that Brown and Don Doing, a superintendent, threatened to fire Grayer because of his testimony. After these alleged threats, Grayer received a number of suspensions. On May 14, 1982, after receiving a five day suspension for absenteeism, Grayer filed a charge of race discrimination and retaliation with the EEOC. The significance of this charge and its subsequent resolution is discussed in Part III below. In pertinent part, the settlement included Grayer's agreement to dismiss his charges and Copperweld's agreement

> to expunge [Grayer's five-day] suspension if he returns to work from layoff and works 60 scheduled days of perfect attendance in accordance with the Attendance Control Program.... Perfect attendance includes late starts, and early quits.

While the Court finds that the requirement of perfect attendance was rather harsh, Grayer did understand it, and did voluntarily agree to its inclusion in the settlement.

Grayer was on lay-off until April 5, 1983. According to Grayer's attendance records (Plaintiff's ex. 7), during the 60 scheduled days after he returned, Grayer had 1 absence, 4 late starts and 3 early quits. Copperweld sent a letter to the EEOC notifying it of this fact and stating that it did not believe that Grayer had fulfilled his obligations under the settlement and that therefore his five-day suspension would not be expunged from his record.

B. On March 19, 1984, Copperweld suspended Grayer for 5 days based on his absenteeism for the period ending February 27, 1984. That suspension was converted into a firing on March 24. For the

90 days prior to February 27, Grayer was absent four times, was late twice and left early twice, for a total equivalence of five and one-third absences.[1] During these 90 days, Grayer was scheduled for 51 days of work (and actually worked 55, not including his four absences).

Copperweld's attendance program defines "excessive absenteeism" as a greater than 5 percent absenteeism rate in any rolling 90 day calendar period. (Plaintiff's ex. G). Three late starts or early quits are equivalent to one absence, and the percentage is determined relative to days scheduled (not days actually worked). Absences are excluded for only a very few, well-defined reasons: vacations; appearing as a witness or juror as further defined in the collective bargaining agreement (which requires that any employee so excused must have been subpoenaed); military encampment; union business; funeral leave as further defined in the bargaining agreement; or a continuing absence due to an extended illness. No early quits or late starts are excused under the program. Although the program states that the 90 day period is to be figured from the most recent absence, the Court notes that a figure attached to a description of the program is drawn in rolling block of three months, *i.e.*, January–February–March; February–March–April; March–April–May; etc.

The program also defines the disciplinary procedure. The first violation by an employee incurs a verbal warning; the second incurs a written warning; the third, a written warning plus a one-day suspension; the fourth, a written warning plus a three-day suspension; the fifth, a written warning plus a five-day suspension; and the sixth, a written warning plus a five-day suspension subject to discharge. If an employee has 90 days of perfect attendance, his last discipline will be removed from his record; however, an additional 90 days of perfect attendance will not remove a second discipline. Perfect attendance is defined as no absences for any reason, no late starts, report offs, or early quits, and no tardiness.[2]

Counting only the absences, Grayer had a 7.8% absentee rate for the period for which Copperweld disciplined him; including the early quits and late starts yields a 10.5% absentee rate. Because of Grayer's previous 5–day suspension, never expunged from his record, this instance of excessive absenteeism subjected Grayer to the sixth step of discipline—a 5–day suspension subject to dismissal; as stated above, Copperweld did indeed fire Grayer.

## II.

Fed.R.Civ.P. 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

The nature of the materials properly presented in a summary judgment pleading is set forth in Fed.R.Civ.P. 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or

---

1. Copperweld in its brief also refers to an absence on November 19, 1984; however, the Court fails to see how this is within the 90 day calendar period specified by Copperweld's absentee program.

2. The Court notes in passing that there appears to be no other way to wipe the slate clean, so that an employee who incurs one violation per year (and is late once per month so that he never has a perfect 90 days) could be fired after 6 years. This, however, is a matter for bargaining between the union and the company, and the Court notes it only because of its strangeness.

denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hasan v. CleveTrust Realty Investors, Inc.,* 729 F.2d 372 (6th Cir.1984). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil trials the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* 106 S.Ct. at 2512. Although "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient to defeat a summary judgment motion, the Court is not precluded from denying a summary judgment motion where it concludes that proceeding to trial is a better course. *Id.* at 2512, 2514.

### III

The effect of Grayer's settlement with Copperweld in 1982, and his compliance with the provisions of that settlement are the key questions of this case. The Court holds that the settlement subsumed all claims for discrimination which occurred prior to the settlement, and that therefore any evidence of discrimination or retaliation which occurred prior to that settlement is irrelevant as far as this case is concerned (except possibly as to show motive); the Court further holds that Grayer failed to comply with the terms of that settlement, thereby releasing Copperweld from its obligation to strike Grayer's 5–day suspension from his record.

A. As stated above, Grayer filed a charge with the EEOC on May 14, 1982 which claimed that Copperweld was continually discriminating against him "because of [his] race, Black and in retaliation for testifying in a Federal Court" in Spiva's Title VII case. This action was settled, and Grayer agreed not to file a law suit based on the charges in the EEOC complaint. Grayer does not now allege that he did not understand the terms of the agreement, and has testified that he did in fact understand those terms. (Grayer's deposition at 84–86).

The effect of the settlement is to bar all further action on the claims then raised. *See Wilmes v. United States Postal Service,* 810 F.2d 130, 132 (7th Cir.1987) (since no material fact exists as to whether plaintiff settled age discrimination claim, he cannot proceeds with a claim based upon the same factual situation.); *see also Freeman v. Motor Convoy, Inc.,* 700 F.2d 1339, 1352 (11th Cir.1983) (knowing and voluntarily signing settlement binds Title VII plaintiff to its terms); *Strozier v. General Motors Corp.,* 635 F.2d 424, 426 (5th Cir.1981) (Title VII plaintiff who freely settles claims may not later sue on same cause of action). Following the reasoning of these courts, this Court holds that Grayer may not press his Title VII claim based on events which occurred prior to the 1982 settlement agreement.

B. In the 1982 settlement agreement, Copperweld agreed to erase Grayer's 5–day suspension if he worked 60 scheduled days of perfect attendance. Perfect attendance meant no absences, no late starts and no early quits. Grayer understood not only the general terms of the agreement, but these specific terms as

well. (Grayer's deposition at 84–86). Grayer does not argue to the contrary; what he does claim is that he received an anonymous phone call telling him that the 60 days should have been calculated from the time of the filing of the EEOC claim, not the time of the settlement, and that Copperweld's management knew this.

The Court does not accept Grayer's contention. The plain language of the agreement is that if Grayer *"returns to work from layoff"* and works 60 days of perfect attendance, then Copperweld will expunge his record. This cannot be read in any way except as calculating the 60 days from when Grayer came back to work after the lay off. Grayer does not dispute that within those 60 days he did not have a perfect attendance, and his employment records clearly show that he did not.

Even if this Court were to accept Grayer's contention as to when the period should have started, Grayer still would not have satisfied the conditions of the agreement. In the 60 days as Grayer calculates it, *see Memorandum in Opposition to Defendant's Motion for Summary Judgment*, at 5, Grayer's affidavit at ¶¶ 18–22, Grayer still had two early quits. Grayer contends that since three early quits or late starts are required to equal one absence, he had a perfect attendance record during the 60 day period. This ignores the express language of the agreement which states that "[p]erfect attendance includes late starts, and early quits." The Court notes that this language is consistent with the definition of perfect attendance found in Copperweld's attendance program. Thus, even under Grayer's interpretation of the agreement, which the Court does not accept, Grayer failed to satisfy his obligations and Copperweld was not required to expunge the 5–day suspension from Grayer's record.

A 5–day suspension is step 5 of Copperweld's discipline procedure. The next instance of excessive absenteeism could cause Grayer to be fired. That instance occurred during the period ending on February 27, 1984.

## IV

A. Title 42 U.S.C. § 2000e–2 (1982) provides in part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin ...

 Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff can establish a *prima facie* case of employment discrimination by satisfying the following criteria:

(i) that he belongs to a racial minority; (ii) that he applied for and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. The *McDonnell Douglas* model is applicable to discharge and discriminatory treatment claims as well as refusals to hire. *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). However, a discharged plaintiff is not required to demonstrate that the employer either continued to seek applications after the plaintiff's dismissal or that he was replaced with a white employee if there is sufficient evidence of disparate treatment. *Beaven v. Commonwealth of Kentucky*, 783 F.2d 672, 676 (6th Cir.1986).

A plaintiff's task in a discrimination case does not conclude with the establishment of a *prima facie* case. The allocation of burdens and order of proof in Title VII cases first enunciated in *McDonnell Douglas* were clarified in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981):

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden

shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Subsequent cases have refined this three-part test still further. If a plaintiff establishes a *prima facie* case, " 'the defendant assumes the burden of *producing* (as distinct from *proving* )' a legitimate nondiscriminatory reason for its actions ... [but] the plaintiff retains 'her continuing burden of *proof*' that the defendant discriminated against her." *Brooks v. Ashtabula County Welfare Dept.*, 717 F.2d 263 (6th Cir. 1983), *cert. denied,* 466 U.S. 907, 104 S.Ct. 1687, 80 L.Ed.2d 160 (1984) (quoting *Norma Miller v. WFLI Radio, Inc.*, 687 F.2d 136 (6th Cir.1982)); *Sones–Morgan v. Hertz Corp.*, 725 F.2d 1070, 1072 (6th Cir. 1984) ("The only burden that shifts at this stage of the proceedings is the burden of going forward with admissible evidence of a legitimate, nondiscriminatory reason for not promoting the plaintiffs.").

■ Grayer has failed to establish a *prima facie* case of racial discrimination. Although he was fired by Copperweld, and is a member of a protected group, he cannot establish disparate treatment.

Because any discrimination which occurred prior to the EEOC settlement is subsumed into that settlement, the Court must look at only those actions occurring after the settlement date for any alleged discrimination. The Court thus disagrees with the EEOC which determined that racial discrimination existed by examining the entire period from when Copperweld began its attendance control program in 1981, to the date of Grayer's firing in 1984. (The EEOC, of course, is not precluded from independently examining Copperweld's administration of its attendance program and bringing suit on its own behalf).

B. Grayer has attached to his motion opposing summary judgment the attendance records of several white employees who Grayer believes have worse attendance records than he does. An independent examination of those records by the Court does not bear out Grayer's contention.

The Court agrees with Copperweld that the total number of absences is the incorrect figure by which to compare its treatment of employees. Rather, to determine whether Copperweld has racially discriminated, the Court must apply Copperweld's policy as set forth in its attendance program: a 5% or greater absenteeism rate in any rolling 90–day period is "excessive absenteeism" subjecting an employee to discipline. Only if Copperweld discriminatorily applied this facially neutral policy can it be found guilty under Title VII. For ease of calculation, and following the figure attached to Copperweld's description of its program, the Court has looked at rolling 3 month periods (January–February–March, February–March–April, etc.). Also, because most of the records kept do not include late starts or early quits, the Court has compared only the number of absences.

First, an examination of Grayer's records indicates that he was subject to discipline for excessive absenteeism for the period December 1983–January–February 1984. Grayer has contested only one of his violations, an early quit on February 1, 1984, because of the necessity to attend a custody hearing for his brother-in-law. Whether Copperweld properly recorded this as an early quit is irrelevant, because the Court has determined that there were enough absences to subject Grayer to discipline, and because, as stated above, the Court has ignored early quits and late starts in making its comparisons.

The Court notes that several of the other employees had long-term illnesses which necessitated them being absent for long stretches of time; however, Copperweld's policy specifically exempts long-term absences because of illness from the calculation of excessive absenteeism. After closely examining the employment records proffered by Grayer, the Court finds that, with one exception, every employee whose

records Grayer has attached received the discipline due under the absentee program.

The one exception is Raymond Shafer. (Plaintiff's ex. B). In September of 1982, Shafer properly received a verbal warning for absenteeism. For the three month period ending December 1982, Shafer should have received further discipline for absenteeism. However, during that period he was absent only one day and exceeded the program's 5% rule only because of the small number of days worked, 18. The Court does not find it surprising, therefore, that Shafer was not reprimanded, either because of a legitimate oversight or because of an affirmative decision to make an exception in an unusual case. During the period ending April 1983, Shafer was again guilty of excessive absenteeism. A verbal warning was given on June 2; according to Copperweld's policy, this should have been a written warning. For the period ending October 1983, Shafer should have received discipline and did not; however, he was disciplined for the period ending November 1983. The Court holds that these two periods are functionally equivalent. This time Shafer received a written warning—step two; he should have received a 1–day suspension—step three. For the period ending February 1984, Shafer was absent 10.7% of the time but was not disciplined. For the period ending July 1984, Shafer was also absent over 10% of the time and this time was disciplined—a three day suspension, step four.

At least with Shafer, then, there is evidence that Copperweld did not follow its absenteeism guidelines. The bottom line with Shafer, though, is that if the one day absence in eighteen is ignored, Copperweld missed one infraction but otherwise eventually disciplined Shafer at the correct level. On the other hand, the Court also notes that the remarks sheets for Shafer show that he was given a verbal warning for an excessive number of late starts, early quits and long lunches. However, none of these were ever marked in his attendance records and this warning had no affect on the discipline for absenteeism as it presumably should have had under Copperweld's policy.

C. Grayer also alleges that Copperweld's policy allowed supervisors to determine whether an employee's absence was just or unjust, and that only unjust absences would be disciplined; Grayer also alleges that this policy was applied discriminatorily. The Court reads this allegation mostly to allege that other employees had more total days off than Grayer and were not disciplined. The Court has discussed and rejected this contention in the preceeding paragraphs.

In so far as Grayer is alleging that justifiable absences were not even marked on the employee records, the Court notes that he has failed to produce a shred of evidence to this effect. While Copperweld's absenteeism policy does talk in terms of justifiable absences, it makes clear that *unjustifiable* absences are subject to immediate discipline, while even justifiable absences will be recorded and possibly subject the employee to future discipline (*i.e.*, if the employee accumulates enough absences to be considered excessively absent).

Finally, the Court reminds Grayer that the overall fairness of Copperweld's policy is not the issue. Whether the absenteeism program is in some sense harsh or unfair, or whether Grayer thought that he was complying with its terms but actually was not (*see* Grayer's deposition at 62–67, 89–94), are issues for collective bargaining and do not by themselves make out a claim of racial discrimination.

## V

The Court concludes that evidence exists that Shafer was treated more favorably than other employees. However, Grayer has presented no evidence that in the period after his settlement with Copperweld, Copperweld applied its absenteeism policy unfairly to any other employees, either more harshly or more leniently. The evidence Grayer has presented, in fact, shows that with the notable exception of Shafer, Copperweld has consistently applied its absenteeism policy to all employees, white and black. The Court therefore grants

Copperweld's motion for summary judgment, and dismisses Grayer's claims.

IT IS SO ORDERED.