**Kenneth ALLEN Plaintiff,**

v.

**MCI TELECOMMUNICATIONS CORP. Defendants.**

**Civ. A. No. C86–1386.**

United States District Court,
N.D. Ohio, E.D.

Sept. 20, 1988.

Dennis J. Niermann, Gross, Goodman & Associates, Cleveland, Ohio, for plaintiff.

David S. Schaefer, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for defendants.

### MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

In a four-count complaint filed in the Cuyahoga County Court of Common Pleas on April 1, 1986, plaintiff Kenneth Allen sought damages and reinstatement following his December 1985 discharge, which he claimed violated an alleged contract of employment with defendant MCI Telecommunications Corporation ("MCI"). MCI removed the action to this Court, and now moves for summary judgment on all counts of the complaint. For the reasons set forth below, this Court grants MCI's summary judgment motion in part, but awards backpay under the doctrine of promissory estoppel in an amount to be set forth in a further order of the Court.

### I.

MCI hired Allen as a Technical Service Representative Level I in August 1983. At or about the time of his hiring,[1] Allen was shown a videotape recording and given an employee handbook outlining various company policies respecting, among other things, employee discipline and discharge procedures. Among the representations contained in the videotape, as recounted by Allen in his brief in opposition to MCI's motion,[2] are the following:

---

1. The pleadings are ambiguous with respect to the order of events surrounding Allen's hire. It is unclear, in particular, whether Allen accepted the position only after receiving the various assurances on which he is attempting to base his wrongful discharge claim. There is no allegation, though, that his acceptance of employment was induced by what he heard and read. Nor is this issue material to the Court's determination.

2. The Court has chosen to set forth the contents of the videotape in this way so as not to omit any representations Allen believes are relevant and also because it finds that, even when highlighted and emphasized in a way that Allen believes most strongly indicates the existence of a contractual relationship, the representations fall short of constituting a contractual promise. The Court has also viewed the videotape itself and discovered no additional representations or

That video tape indicated, among other things, that "We have to recognize *and honor* our responsibilities to each other." (Emphasis added). MCI then proceed [sic] to promise it would "conduct fair performance evaluations", that "it pays to do a good job at MCI", and that MCI's responsibilities to its employees included: a fair and equitable pay policy, regular review of job performance, *every effort to provide stability of employment,* opportunity for advancement, *competent* and courteous supervision, non-discrimination and prompt attention to problems. (Emphasis added.) The tape then went on to indicate that MCI employees also had responsibilities to the company, which included doing their best at work, avoiding personal business, respecting others, avoiding conflicts of interest and avoiding receiving outside gifts. The relevant portion then concluded that problems could be resolved on a one to one basis with supervisors, so there was no need for a union (and therefore by implication, collective *contractual* bargaining).

The relevant portion of MCI's employee handbook reads as follows:

Discipline

MCI believes that discipline should be corrective rather than punitive. In many instances, a problem can be corrected quickly and simply through a discussion between the employee and his or her supervisor. However, if informal talks do not result in improved performance, the following corrective disciplinary action may be instituted:

Warning: Oral and/or written reprimand.

Probation: Written notice of probation.

Suspension: In lieu of or after probation, an employee may be suspended up to five days without pay.

Final Action: Discharge or restoration to good standing.

This sequence of disciplinary action will normally be observed except when the severity of the infraction requires

information material to the Court's determina-

immediate discharge or when it is determined that corrective action will serve no purpose. Some conduct is so serious that it is grounds for immediate severe disciplinary action, up to and including discharge. However, to ensure the uniform and consistent application of the Company's disciplinary policy, all suspension and discharge actions will be reviewed by the Vice President of Human Resources or his designee.

The handbook goes on, in the following section, to refer employees to the "Personnel Policy and Procedure Manual", which "is to be considered the final authority on the[ ] subjects" discussed in the handbook. On the subject of employee discipline, the Manual provides as follows:

The specific disciplinary action initiated in a particular instance will depend upon the nature of the incident or situation and the employee's past performance. Should circumstances warrant, an employee may be suspended or discharged without prior disciplinary action. The disciplinary actions which may be employed by company personnel are described in the following paragraphs.

\* \* \* \* \* \*

Shortly after beginning work, Allen approached his supervisor, John Engel, for a clarification of the company's progressive discipline policy, about which Allen had read in the employee handbook. According to Allen's affidavit, Engel explained that an employee whom the company wishes to discipline first receives an oral warning, and thereafter, where warranted, a written warning, probation, suspension, and finally discharge. Allen avers that, later the same day, he spoke with Nick Gibson, MCI Operations Manager, who indicated that MCI personnel at all levels would endeavor to treat Allen fairly. Gibson also showed Allen the forms the company used in implementing its discipline procedure.

Allen's first employment evaluation, given in March of 1984, rated his overall per-

tion.

formance "very good,"[3] as did his next performance evaluation in August, 1984. On September 1, 1984, Allen was promoted to the position of Technical Service Representative Level II. Allen never received an overall performance evaluation of less than "very good," although his ratings in the "Human Relations" and "Communications" categories declined to and remained at the "generally good" level. Allen admits to having protested these later evaluations and to having refused to sign them.

Allen claims to have been promised, at some unspecified time during his employment, a 10%–12% pay raise. He avers that he turned down an offer of employment from another communications company in reliance on Gibson's representations to that effect. When he received an 8% pay raise instead, he was extremely dissatisfied and, according to the company, attempted to return the additional money in protest.

Allen's wife was (and remains) employed with MCI as well. The parties offer differing accounts of MCI's perception of their office relationship.[4] Allen reports that he and his wife were instructed that, pursuant to MCI's "Employment of Relatives" policy, they would "have to transfer or be fired." He also describes another situation involving two male employees who became related through marriage but against whom no action was taken. MCI, on the other hand, characterizes Allen's office relationship with his wife as ultimately responsible for his discharge. The company relates an incident in which Engel told Allen that he and his wife were spending too much time together during working hours. Allen, according to the company, became infuriated and demanded to see Gibson. Once in Gibson's office, he insisted on knowing who had complained about the time spent with his wife, and complained about unrelated events as well, such as his performance evaluations. As a result of this encounter, according to MCI, Allen was terminated on December 3, 1985. The termination was, according to Allen, unaccompanied by any written or oral explanation, and not preceded by any of the progressively more severe disciplinary actions he claims were taken in other employees' cases and mandated by company policy.

## II.

Fed.R.Civ.P. 56(c) governs summary judgment motions and provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

The nature of the materials properly presented in a summary judgment pleading is set forth in Fed.R.Civ.P. 56(e):

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

However, the movant is not required to file affidavits or other similar materials negat-

---

**3.** MCI employed a six-point scale on which "very good" was the third highest level. The scale used is as follows: Outstanding—Excellent—Very Good—Generally Good—Improvement Required—Unacceptable.

**4.** Although the Court has identified this and other factual disputes, it does not consider them material to the outcome of the present litigation, and so does not regard them as a bar to its summary disposition. In essence, the disputes concern actions of MCI that might be considered breaches of an employment contract *if* such a contract were shown to exist.

ing a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hasan v. CleveTrust Realty Investors, Inc.*, 729 F.2d 372 (6th Cir.1984). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil trials the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* 106 S.Ct. at 2512. Although "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient to defeat a summary judgment motion, the Court is not precluded from denying a summary judgment motion where it concludes that proceeding to trial is a better course. *Id.* at 2512, 2514.

### III.

The facts as alleged by Allen present for consideration two interdependent issues that are not clearly distinguished by either party. The first question, which this Court regards as critical, is whether there existed, in the employment relationship between Allen and MCI, an express or implied contract that limited MCI's right to terminate Allen, or a promise, similar in effect, on which Allen could have detrimentally relied. The second question, which is not even reached if the first question is answered in the negative, concerns the permissibility, under the putative contract or in view of the promise, of the action taken against Allen. Because this Court finds that any "contract" or "promise" that may have existed did not limit MCI's ability to discharge Allen, it does not address the second question.

There can be no question but that in Ohio, whose law this Court is constrained to apply, the doctrine of employment-at-will enjoys continued vitality. *See Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985); *Phung v. Waste Management, Inc.*, 23 Ohio St.3d 100, 491 N.E.2d 1114 (1986). According to that doctrine, "either [an employer or an employee] ... may terminate the employment relationship for any reason which is not contrary to law." *Mers*, 483 N.E.2d at 153. The ability of a party to terminate the relationship is not even circumscribed by a good faith requirement. *Id.* at 155. Although the parties remain free to modify the operation of the doctrine by contract, the employment relationship will be presumed to be at will unless there are "facts and circumstances which indicate that the agreement is for a specific term," *Henkel v. Educational Research Council*, 45 Ohio St.2d 249, 344 N.E.2d 118 (1976), or unless the contract expressly or impliedly imposes a "just cause" restriction on the employer. In determining whether a contract so limits an employer, "the facts and circumstances surrounding an oral employment-at-will agreement, including the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the agreement's explicit and implicit terms concerning discharge." *Mers*, 483 N.E.2d at 154. Even where the formal requisites of a contract are not present, however, "[a]n additional limit on an employer's right to discharge occurs where representations or promises have been made to the employee which fall within the doctrine of promissory estoppel." *Id; Biskupich v. Westbay Manor Nursing Home*, 33 Ohio App.3d 220, 515 N.E.2d 632, 633 (1986). Thus, to the extent a court finds that injustice can only so be avoided, it may enforce "[a] promise which the promisor should reasonably expect to

induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance...." *Id., quoting The Restatement of Contracts Second,* § 90.

## IV.

■ In the present case, this Court can identify no representations made in the videotape, handbook, or Manual, or by MCI personnel, that qualify either as an offer of contract or as a promise limiting MCI's ability to terminate Allen. Representations in the videotape to the effect that MCI would "honor [its] responsibilities" and "conduct fair performance evaluations" are sufficiently vague that they amount at most to unilateral statements of employer policy. Even the most suggestive remark —that MCI would make "every effort to provide stability of employment"—is far too indefinite to satisfy the *Henkel* requirement of a promise of a specific term of employment. Allen cannot claim that, by reason of such a remark, there was a meeting of the minds with respect to the conditions under which MCI could terminate him.

The same can be said of the employee handbook. Nowhere is there a promise of a definite term of employment, or a statement of the conditions MCI regards as warranting discharge. The statements that address these issues, moreover, employ permissive, as opposed to imperative, locutions. MCI enumerates the disciplinary measures that *'may* be instituted," and comments that, while that sequence will *"normally* be observed," employees may also be immediately discharged for severe infractions or where "corrective action would serve no purpose." (Emphasis added.) The Court places the most reasonable interpretation on these qualifications, which is that MCI has expressly reserved the right to terminate its employees at will.

The policies set forth in the Manual reinforce this conclusion. The Manual again lists the progression of disciplinary actions, which it again says *may* be instituted depending on the nature of the incident or situation. Significantly, the Manual contemplates the discharge of employees "without prior disciplinary action" should the circumstances warrant.

The cases cited by Allen in which courts have inferred the existence of a contract of employment from an employer's promulgation of progressive disciplinary procedures are distinguishable from the case at bar. The courts in *Mastroianni v. Marymount Hospital,* Cuy.App. No. 521178 (November 26, 1986) [1986 WL 13612], and *Biskupich v. Westbay Manor Nursing Home,* 33 Ohio App.3d 220, 515 N.E.2d 632 (1986), it is true, held that the factual issues presented by the employee manuals in those cases precluded summary judgment for the employers. Neither court, however, condemned in principle the practice of granting summary judgment in cases where the significance of an employee manual is at issue. Nor could a court so hold consistently with Fed.R.Civ.P. 56 (which rule, as interpreted by federal courts, this Court is obliged to apply). For the mere existence of representations concerning discharge and discipline procedures does not guarantee that reasonable minds could come to different conclusions about their meaning. What this Court finds is that, given the meaning of the statements actually made by MCI, reasonable minds can conclude only that MCI did not intend to create rights of continued employment, but expressly reserved the right to terminate its employees at will.

In this respect, the representations at issue also differ from those in *Mullen v. Administrator, O.B.E.S.,* Cuy.Cty.App. No. 49891 (January 16, 1986) [1986 WL 855], a case relied on by Allen for the proposition that "[f]airness requires that an employee not be subject to more severe discipline than that provided for by company policy." *Id.,* slip op. at p. 10. The discipline policy in *Mullen* was described by a supervisor as follows: "An employee *will* be given three written warnings after the third written warning that can or may be cause for dismissal immediately." *Id.,* slip op. at pp. 9–10 (emphasis added). Unlike the representations at issue in the present case, then, the *Mullen* policy did

not reserve an "out" allowing the company to circumvent the normal procedure.

This Court does, however, agree with the *Mullen* court's observation that "[p]rogressive disciplinary systems create expectations on which employees rely," *id.*, slip op. at p. 10, and endorses the principle that fairness requires that the discipline employed be commensurate with the infraction and consistent with any announced policy. The Court simply cannot, under the current state of Ohio law, translate those expectations into legal entitlements, or enforce that fairness.

Although it need not make a finding on the issue, the Court notes that MCI's termination was "for cause," even though the Court may not agree with MCI's reasons or its assessment of the severity of Allen's infraction. MCI's action was therefore not arbitrary, and would not be actionable, in the absence of a contract or detrimental reliance, even if it were. Similarly, Allen's references to other employees in whose cases the progressive discipline procedures were followed speak to the consistency of MCI's actions, and so would be significant only if MCI were obliged by contract or promise to act consistently. Having identified no such contract and no such promise, the Court is not persuaded by these and other arguments intended to establish a contract breach or promissory estoppel. It also follows, necessarily, that Allen's claims for intentional or negligent infliction of emotional distress must fail.

There is, however, one issue that, although immaterial to Allen's wrongful discharge claim, remains unaddressed by MCI. Allen claims to have rejected an offer of employment from another company in reliance on Gibson's promise of a 10%–12% pay increase, but that he in fact received only 8%. Such forbearance is precisely the sort that the doctrine of promissory estoppel is intended to compensate. To enforce Gibson's promise, whose existence is unrebutted, the Court requires additional evidence, which it invites both parties to submit, concerning the time at which the promised raise was to have become effective. After receiving such evidence, the Court will award backpay in the amount of the difference between what Allen was promised and what he received during the period after such effective date but preceding his discharge.

V.

For the reasons set forth above, this Court grants summary judgment in favor of MCI on three of the four counts of Allen's complaint, but awards Allen backpay in an amount to be set forth in a further order of the Court. Evidence relating to the amount of backpay shall be provided to the Court within fifteen (15) days of the date of this Order.

IT IS SO ORDERED.